**PORTLAND PIPE LINE CORPORATION**

v.

**ENVIRONMENTAL IMPROVEMENT
COMMISSION et al.,**

and

**AMERICAN OIL COMPANY et al.,**

v.

**ENVIRONMENTAL IMPROVEMENT
COMMISSION et als.**

Supreme Judicial Court of Maine.

June 4, 1973.

———◆———

Pierce, Atwood, Scribner, Allen & Mc-Kusick, by Gerald M. Amero, Fred C. Scribner, Jr., Bruce A. Coggeshall, Portland, for plaintiffs.

E. Stephen Murray, John M. R. Paterson, Asst. Attys. Gen., Augusta, Covington & Burling by Roberts B. Owen, Washington, D. C., William H. Allen, Arlington, Va., Richard B. Herzog, Washington, D. C., for defendants.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

POMEROY, Justice.

In the period from about 1960 to 1973 peoples throughout the world have wakened to the awful truth that if man continues random destruction of his natural environment, his natural environment will ultimately destroy him.

This destruction of the environment is not confined to the land alone, or the sea alone or the air alone.

Inspired by this sudden consciousness of the perils of pollution, legislative bodies everywhere have passed legislation designed to diminish pollution of our environment. Our Maine Legislature has been in the forefront of those seeking to control, and where necessary abate, threats of environment destruction.

In 1970, recognizing and declaring that,

" . . . the transfer of oil, petroleum products and their by-products between vessels and vessels and onshore facilities and vessels within the jurisdiction of the State and state waters is a hazardous undertaking; that spills, discharges and escape of oil, petroleum products and their by-products occurring as a result of procedures involved in the transfer and storage of such products pose threats of great danger and damage to the marine, estuarine and adjacent terrestrial environment of the State; . . ."
38 M.R.S.A. § 541

the Legislature of Maine passed the Oil Discharge Prevention and Pollution Control Act of 1970.

Plaintiffs in these cases being directly affected by the operation of the Act have, by appropriate procedure, presented the Act to us that we may test it, that assurance may result that neither the Act, nor any portion thereof, offends the proscriptions of the Constitution of the United States and/or the Constitution of the State of Maine.

We shall never cease to be amazed by the genius of the little band of men who in 1787 conceived and penned the Charter which has endured all these many years. Our admiration is no less for the equally small group who in 1820, conceived and adopted the Charter of the State of Maine. Although there have been relatively minor amendments to both documents, both have

remained viable and substantially unchanged with the passing years.

Amazing though it may seem to those unfamiliar with the American system, those two marvelous instruments, born of another age, are still, in this year 1973, the Plimsoll line demarking that which legislative bodies may do and that which they cannot do.

Though the economic, social and political conditions today are as dissimilar from the economic, social and political conditions existing in 1787 and 1820 as night is from day, the principles so plainly and concisely laid down in the two great Charters are as applicable to problems of the atomic age as to the age when the United States was a tiny nation nestled along the Atlantic Coast.

Because in 1803 Mr. Chief Justice Marshall in the landmark decision Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60, declared:

> "It is emphatically the province and duty of the judicial department to say what the law is."

it is our duty, when called upon to do so by appropriate procedure, to test laws passed by legislative bodies to see that such laws are not wanting when measured against the proscriptions of our Charters.

> "If, then, the courts are to regard the constitution; and the constitution is superior to any ordinary act of the legislature; the constitution, and not such ordinary act, must govern the case to which they both apply."

Marbury v. Madison, supra.

In the performance of our judicial duty we now proceed to examine 38 M.R.S.A. §§ 541–557 to see if our Legislature in enacting this law has done what the Constitution of Maine or the Constitution of the United States has forbidden it to do.

These cases are before this Court pursuant to Rule 72(b) M.R.C.P. upon request of all parties appearing and upon agreement as to all material facts, for us to render such decision as the rights of the parties require. The cases contain some factual differences. However, since the cases have many common issues of law, we shall treat them jointly.

Plaintiffs in these actions seek declaratory judgments determining that Chapter 572 of the 1969 Public Laws of Maine, An Act Relating to Coastal Conveyance of Petroleum,[1] violates various provisions of the United States and Maine Constitutions.

We find that within the factual framework here before us the statute is not unconstitutional on its face and as applied to these plaintiffs.

The Legislature has made an extensive statement of the purpose of the Act.[2]

> "The Legislature finds and declares that the highest and best uses of the seacoast of the State are as a source of public and private recreation and solace from the pressures of an industrialized society, and as a source of public use and private commerce in fishing, lobstering and gathering other marine life used and useful in food production and other commercial activities.

> "The Legislature further finds and declares that the preservation of these uses is a matter of the highest urgency and priority and that such uses can only be served effectively by maintaining the coastal waters, estuaries, tidal flats, beaches and public lands adjoining the seacoast in as close to a pristine condition as possible taking into account multiple use accommodations necessary to provide the broadest possible promotion of public and private interests with the least possible conflicts in such diverse uses.

---

1. Now 38 M.R.S.A. §§ 541–557. [hereinafter called the Act.]

2. 38 M.R.S.A. § 541.

"The Legislature further finds and declares that the transfer of oil, petroleum products and their by-products between vessels and vessels and onshore facilities and vessels within the jurisdiction of the State and state waters is a hazardous undertaking; that spills, discharges and escape of oil, petroleum products and their by-products occurring as a result of procedures involved in the transfer and storage of such products pose threats of great danger and damage to the marine, estuarine and adjacent terrestrial environment of the State; to owners and users of shoreline property; to public and private recreation; to citizens of the State and other interests deriving livelihood from marine-related activities; and to the beauty of the Maine coast; that such hazards have frequently occurred in the past, are occurring now and present future threats of potentially catastrophic proportions, all of which are expressly declared to be inimical to the paramount interests of the State as herein set forth and that such state interests outweigh any economic burdens imposed by the Legislature upon those engaged in transferring oil, petroleum products and their by-products and related activities.

"The Legislature intends by the enactment of this legislation to exercise the police power of the State through the Environmental Improvement Commission by conferring upon said Commission the exclusive power to deal with the hazards and threats of danger and damage posed by such transfers and related activities; to require the prompt containment and removal of pollution occasioned thereby; to provide procedures whereby persons suffering damage from such occurrences may be promptly made whole; and to establish a fund to provide for the inspection and supervision of such activities and guarantee the prompt pay-

ment of reasonable damage claims resulting therefrom.

"The Legislature further finds and declares that the preservation of the public uses referred to herein is of grave public interest and concern to the State in promoting its general welfare, preventing disease, promoting health and providing for the public safety, and that the State's interest in such preservation outweighs any burdens of absolute liability imposed by the Legislature upon those engaged in transferring oil, petroleum products and their by-products and related activities."

The substantive provisions of the Act contain a prohibition of the discharge of oil into or upon coastal waters and adjoining land and waters that drain into coastal waters.[3] The activities of both oil terminals and the vessels which serve them are regulated and such terminals are required to obtain a license.[4] Persons who discharge oil into or upon coastal waters are charged with the duty of cleaning up the spill to the satisfaction of the Commission and the Commission is empowered to effect a clean-up if the person responsible fails to do so or if the person responsible is unknown (the so-called "mystery spills.")[5]

The sections of the Act which create the Coastal Protection Fund and provide for expenditures from it and reimbursements to it [sections 551 and 552], are the critical sections of the Act insofar as the questions raised in these actions are concerned.

Section 551 creates the Fund and defines its uses. The Fund is a "non-lapsing, revolving fund" limited to four million dollars. The initial funding is effected by the imposition of an annual license fee determined on the basis of one-half cent per barrel of petroleum products transferred over water during the licensing period. The license fee is imposed on "oil terminal

---

3. 38 M.R.S.A. § 543.

4. 38 M.R.S.A. §§ 544, 545, 546, 549, 550.

5. 38 M.R.S.A. § 548.

facilities." [6] When the four million dollar limit is attained, the license fee will drop to a level sufficient to meet the continuing administrative expenses, unreimbursed charges,[7] and the costs of authorized research and development.

The Fund is to be used for making the initial payment of costs of cleaning up spills undertaken by the Commission under the authority of Section 548, and for compensating third party claims authorized by Section 551(5). Expenditures made for these purposes are to be recovered, with certain limitations, from the person "permitting" the unlawful discharge under Section 551(6).

The third party damage claims may be liquidated by agreement among the claimant, the Commission and the person causing the discharge. If agreement among these parties cannot be reached, the claim is to be submitted to a Board of Arbitration [8] for action. Section 551(2) establishes this procedure as the exclusive means for third parties to recover damages.

Section 552 provides for the liability of licensed oil terminal facilities. This liability includes responsibility not only for the acts of the servants and agents of the licensee but also makes the terminal vicariously liable for acts and omissions of carriers "destined for the licensee's facilities" from the time the vessel enters the twelve mile limit until the time the vessel leaves State waters. The second part of this section of the Act provides that the liability of the licensee shall be absolute. In any action for reimbursement against a terminal

the State is not required to establish negligence. It need only plead and prove the fact of the prohibited discharge or other polluting condition and that it occurred at facilities under the control of the licensee or was attributable to carriers or others for whom the licensee is responsible as provided in the subchapter.

A Justice of the Superior Court issued a Preliminary Injunction on June 24, 1970, providing that: all plaintiffs shall continue to operate under temporary licenses granted by the E.I.C.; each plaintiff shall complete a license application to be held by the Court until the case is decided; and no plaintiff shall be required to comply with subsections 4 and 6 of Section 551 nor with the *"vicarious liability"* provision of Section 552(1) pending further Order. This exemption was conditioned upon the maintenance of accurate records of the total volume of oil, in barrels, transferred by the plaintiffs and upon either the posting of a bond or the payment into an escrow account of one-half cent per barrel of oil transferred during this litigation.[9]

We are to decide the constitutional issues raised by examining the Act on its face and as applied within the framework of the stipulated facts.

In passing on the constitutionality of any act the Court assumes the Legislature acted with knowledge of constitutional restrictions. All acts of the Legislature are presumed to be constitutional and this is a presumption of great strength. State v. Fantastic Fair & Karmil, 158 Me. 450, 186 A.2d 352 (1961); State v. Poulin, *alias Pooler*, 105 Me. 224, 74 A. 119 (1909).

6. "Oil terminal facility" as defined by Section 542(7) includes shore facilities used for the offloading or onloading of petroleum products and certain vessels involved in vessel-to-vessel transfers of petroleum products taking place within the twelve mile limit established by Section 544(1).

7. Clean-up expenses for which the Fund will not be reimbursed include: (1) "mystery spills" where it is impossible to assign liability; (2) the first $15,000 ex-

pended to clean up a spill "promptly reported" by a licensee under Section 551(6)B; and (3) costs associated with a spill for which reimbursement is waived under Section 551(7).

8. The composition of the Board of Arbitration is controlled by Section 551(3).

9. From May 9, 1970, the effective date of the Act, through February 25, 1972, $1,835,296 had been paid into escrow by the plaintiffs.

The burden is upon the plaintiffs to show the unconstitutionality of the Act. Verreault v. City of Lewiston, 150 Me. 67, 104 A.2d 538 (1954); Inhabitants of the Town of Warren v. Norwood, 138 Me. 180, 24 A.2d 229 (1941). All reasonable doubts must be resolved in favor of constitutionality of the Act and if the Act is susceptible of more than one interpretation, we must adopt an interpretation, if one there be, which will render it constitutional. Crommett v. City of Portland, 150 Me. 217, 107 A.2d 841 (1954); In re Stubbs, 141 Me. 143, 39 A.2d 853 (1944).

Portland Pipe Line is a Maine corporation engaged in business as a common carrier, licensed and regulated by the Interstate Commerce Commission, transporting oil by pipe line from its terminal in South Portland to the Canadian border at North Troy, Vermont. At this point the oil is delivered to a connecting common carrier for transportation to Montreal. All oil tendered to Pipe Line, under conditions set forth in its approved tariffs,[10] is offloaded at its pier in South Portland and is received solely for transportation.

Pipe Line has no property interest in the oil thus received.

The oil is received under the supervision and control of customs officials, solely for export and cannot be diverted for use in Maine.

Pipe Line has no ownership interest in any of the vessels offloading at its pier nor does it charter or have contractual relationship with any of these vessels. The operational and navigational control of vessels proceeding to or leaving Pipe Line's pier is in the hands of the ship's Master and the harbor or docking pilot.

Except for a small amount of oil received in 1969, all oil offloaded at Pipe Line's pier during the past six years has been shipped from points in foreign countries. All oil received at its facilities in the near future will be of foreign origin. All vessels delivering oil to its pier, whether United States or foreign flag vessels, hold Coast Guard certificates, or the equivalent, and have established financial responsibility under federal regulations.

Plaintiffs in the second action are ten major oil companies—American, Chevron, Cities Service, Getty, Gulf, Humble, Mobil, Shell, Sun and Texaco—incorporated in states other than Maine and qualified to do business in Maine. Each operates an oil terminal facility located on Portland Harbor. In addition, seven of these Plaintiffs have oil terminal facilities upon navigable waters in other parts of the State.

There are occasional vessel-to-vessel transfers which take place in Hussey Sound (Portland Harbor). The products are transferred from tankers to barges which then proceed to terminals in Maine and other states.

Almost all petroleum products used in Maine are offloaded at these facilities.

Approximately thirty percent of the products received is fuel for use in internal combustion engines. Most of the products come to Maine from points within the United States. However a substantial percentage has been shipped directly from foreign sources. The petroleum products are then distributed from plaintiffs' terminals to points in Maine and in other nearby states. Exceptions to this general manner of distribution include aviation fuel, shipped under bond from Caribbean refineries, brought into Maine to service international aircraft, and fuel, also brought into Maine under bond, used to bunker foreign vessels.

The oil companies have a possessory interest in most products offloaded at their terminals. Once again there are exceptions such as the bonded fuels and the transfer of oil at one of the plaintiff's ter-

10. These tariffs are filed with the I.C.C. under 49 U.S.C.A. § 1. The regulatory power of the I.C.C. includes the authority to regulate rates.

minals which belongs to another distributor.

The vessels arriving at the terminals may be under charter or, in some instances, owned by the terminal operator. The navigational and federal regulatory procedures are identical to those of ships destined for the Pipe Line terminal.

## I Gasoline Tax

■ The oil companies contend that inasmuch as the fee for licensing their terminals· is based on the transfer of gasoline or other motor vehicle fuels and since the revenues thus derived are used under the Act for purposes unrelated to highway or bridge construction or the enforcement of traffic laws, the Act conflicts with the State Constitution.

Article IX, Sec. 19 of the Maine Constitution provides:

"All revenues derived from fees, excises and license taxes relating to registration, operation and use of vehicles on public highways, and to fuels used for the propulsion of such vehicles shall be expended solely for cost of administration, statutory refunds and adjustments, payment of debts and liabilities incurred in construction and reconstruction of highways and bridges, the cost of construction, reconstruction, maintenance and repair of public highways and bridges under the direction and supervision of a state department having jurisdiction over such highways and bridges and expense for state enforcement of traffic laws and shall not be diverted for

any purpose, provided that these limitations shall not apply to revenue from an excise tax on motor vehicles imposed in lieu of personal property tax."

We agree that the statutory uses of the revenue derived from the transfer of motor vehicle fuels prescribed by the Act are not consistent with those specified in Maine Constitution, Article IX, § 19. The issue for this Court then, is whether or not the revenues derived from the license fees paid by oil terminal facilities constitute "revenues derived from fees, excises and license taxes relating . . . to fuels used for the propulsion" of vehicles on public highways.[11]

The rules which guide this Court in determining the meaning of constitutional provisions are set forth in Opinion of the Justices, 142 Me. 409, 60 A.2d 903 (1947). There we said

"The fundamental rule of construction of statutory and of constitutional provisions is that the language shall be interpreted in accordance with the intention with which it was used, if that result may be accomplished by giving words their ordinary and usual significance."

And further,

"It is proper in construing constitutional language to give decisive weight to the history of its development."
142 Me. at 415, 60 A.2d at 906.

The Supreme Judicial Court of Massachusetts, in construing a constitutional amendment, stated that the amendment

11. This Court has, on three occasions, considered the language of Article IX, Section 19. Two of these decisions, Opinion of the Justices, 146 Me. 249, 80 A.2d 417 (1951) and Opinion of the Justices, 152 Me. 449, 132 A.2d 440 (1957), are not applicable to the instant case because in each of those opinions the funds were admittedly within the scope of the amendment and the sole issue was the one to which these funds would be put. The third decision, Opinion of the Justices, 155 Me. 125, 152 A.2d 494 (1959), construes the phrase "relating to registration, operation and use of vehicles on public highways." The Court held that a fee charged on uninsured vehicles, to be used to create a fund to defray damages suffered in accidents involving uninsured vehicles, was a precondition to registering a motor vehicle. It therefore "related to" registration and could not be constitutionally imposed unless the revenue derived therefrom were dedicated to the approved uses.

" . . . was written to be understood by the voters to whom it was submitted for approval. It is to be interpreted in the sense most obvious to the common intelligence."

Yont v. Secretary of Commonwealth, 275 Mass. 365, 366, 176 N.E. 1, 2 (1931).

Maine first began deriving revenue from motor vehicle fuels in 1923 with the enactment of a one cent per gallon tax.[12] In later sessions the Legislature, while increasing the levy, allowed exemptions to be claimed by certain users of gasoline.[13] The plan of the "gasoline tax" was to focus on those who derived benefits as users of the highway system as the class subject to the tax.[14] While the entire tax has never been subject to an exemption,[15] that part imposed without exemption was rationalized as a minimum payment by otherwise exempt users for residual benefits derived from good roads.[16] The minimum gasoline tax collected from otherwise exempt users has also been expended for purposes other than specified in Article IX, Section 19.[17] It is apparent to this Court that the gasoline tax statutes are intended to result in taxation of highway users.

Plaintiffs contend this cannot be the intention of the Legislature because the tax is imposed on gasoline distributors. Because the tax is imposed in the first instance upon distributors in no way alters the legislative intent to have the tax fall upon highway users. The distributor is al-lowed to "pass on" the tax. It is the "non-highway" user of gasoline who may receive a refund. The imposition of the tax on the distributor was merely a means adopted by the Legislature to simplify the tax collection process.[18]

In 1934 Congress became convinced that it was unfair to tax motor vehicle transportation unless the revenues thus derived were applied to the construction and maintenance of highways. To further this end, Congress passed what is now 23 U.S.C. § 126, which provided that federal highway funds would be withheld from any state which did not apply gasoline taxes and other taxes on motor vehicle owners and operators to highway purposes.

The Maine Legislature responded in 1936 by reserving for highway purposes the taxes derived from the "tax imposed on internal combustion fuel."[19] The Legislature, shortly thereafter, amended the statute to allow these funds to be used for other than highway purposes pending the collection of general revenues.[20] The constitutional provision now in question was adopted by the people in 1943. The Legislative Record does not indicate that the anti-diversion amendment was to be any broader in scope than the 1936 statute. The Legislature and the people had been accustomed since 1923 to the "gasoline tax," a tax imposed on highway users. It was this revenue that was protected from diversion to non-highway uses.

12. Ch. 224, [1923] Me.Laws 387.

13. Ch. 212, § 11, [1925] Me.Laws 203. For those presently exempted, see 36 M.R.S.A. § 2908.

14. Me.Leg.Rec. 154 (1925) (remarks of Senator Maher) ; Me.Leg.Rec. 905 (1925) (remarks of Rep. Hamilton.)

15. The original one cent per gallon tax imposed has not been subject to an exemption. Presently only eight-ninths of the nine cent per gallon tax imposed on gasoline may be refunded to non-exempt users. 36 M.R.S.A. § 2908.

16. Me.Leg.Rec. 1153 (1925) (remarks of Rep. Hamilton.)

17. Under 36 M.R.S.A. § 2912 revenues derived from taxes on aviation gasoline were originally credited to an aviation fund. Under that section as amended those revenues go into the General Fund.

18. See the debates in Me.Leg.Rec. 903, 1147–1154 (1925).

19. *An Act* Relating to the Use of the General Highway Fund, and to Prevent Diversion Thereof, was directly initiated by and approved by the People of Maine at the General Election held Sept. 14, 1936.

20. P.L.1937, Ch. 1.

The Coastal Conveyance Act imposes a license fee upon those engaged in over-water transfers of petroleum products. From the history of gasoline taxation in Maine, we hold that the revenues thus derived are not revenues "derived from fees, excises and license taxes relating to fuels used for the propulsion of . . . " motor vehicles, and therefore it is not constitutionally required that the revenues derived under the Act be used for highway purposes.

## II Due Process

Plaintiffs contend that the arbitration procedure provided by Section 551 of the Act offends the due process provisions of both the United States and Maine Constitutions.

### A. Procedure

The Act provides that hearings "shall be informal" and that the rules of evidence "shall not be binding." [21] The terminal operators brand this a "no-rule" system and argue that due process requires procedural safeguards akin to judicial proceedings.

A judicial proceeding is not an element of due process. Randall v. Patch, 118 Me. 303, 108 A. 97 (1919). Procedural due process requires no particular form of procedure. State v. Johnson, Me., 265 A. 2d 711 (1970). The rules of evidence are not binding on administrative bodies as they are empowered by statute to receive evidence not ordinarily admissible in judicial proceedings. 5 M.R.S.A. § 2405.

In State v. Johnson, supra, this Court ruled that the hearing provisions of the Wetlands Act met "all requirements of due process." That Act merely provided for a hearing with notice and made no attempt to set out rules of procedure for such a hearing.

While it is well settled that the terminal operators are entitled to such procedural processes as will satisfy demands of due process, Kovack v. Licensing Board of City of Waterville, 157 Me. 411, 173 A.2d 554 (1961), we cannot in the present posture of this case anticipate that an arbitration proceeding conducted in the future will, in fact, offend due process requirements.

Plaintiffs' complaint in this regard is premature.

In Hannah v. Larche, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960), cited by the plaintiffs, the Court was concerned with determining whether specific rules of procedure adopted by the Commission on Civil Rights satisfied requirements of the Due Process Clause in the Fifth Amendment of the Constitution of the United States.

In the instant case we have no such specific rules before us as none has been adopted. We can only say "due process of law" or "the law of the land" (Maine Constitution, Article I, Sec. 6), does not require a hearing before a judicial tribunal carried out with all the trappings known to judicial proceedings whenever any right or liability of a person is being determined in an administrative hearing.

In effect the plaintiffs ask us to now declare that arbitration proceedings which may be conducted in the future will necessarily violate due process requirements because the Act provides that such proceedings shall be informal and rules of evidence shall not be binding.

This we cannot do.

"One who seeks to assert a particular conglomerate of circumstances in which the operation of the statute might be unconstitutional must prove such facts in an actual case to test the constitutionality of the statute, as applied, rather than to seek to invalidate it on its face by hypothesizing marginal situations in which the statute might be conceived to operate with unduly oppressive or unjus-

21. 38 M.R.S.A. § 551 (3) (D).

tifiably arbitrary impact indicative of unconstitutionality."

State v. Richardson, Me., 285 A.2d 842 at 846 (1972)

The Act provides for review of the decision of the Board of Arbitration in Superior Court. Such review is limited, however, to "matters relating to abuse of discretion by the board," since the board's determination is final.[22] Plaintiffs contend that the board has such broad discretion that abuse would be impossible to show, therefore, the right of appeal is "virtually meaningless."

■ The right of appeal is not a constitutional right. It may be granted subject to such restrictions, limitations and conditions as the Legislature may attach to it. Harrington v. Harrington, Me., 269 A.2d 310 (1970).

■ Empowering an administrative agency with a discretionary fact-finding function is not a violation of due process. This Court has upheld such a delegation of authority in Chequinn Corp. v. Mullen, 159 Me. 375, 193 A.2d 432 (1963); Kovack v. Licensing Bd. of City of Waterville, supra, and American Fidelity Co. v. Mahoney, 157 Me. 507, 174 A.2d 446 (1961).

In any event, the Board of Arbitration will not exercise "unfettered" discretion in determining the amount of third party damage claims. The Act provides for review on matters of discretion. The board cannot engage in arbitrary or capricious action. A reviewing Court in determining whether the board has acted reasonably may decide if the board decision has a rational factual basis or has substantial support in the evidence. Central Maine Power Co. v. Waterville Urban Renewal Authority, Me., 281 A.2d 233 (1971). Therefore the basic guarantees of due process are observed in the Act.

Plaintiffs' final procedural due process argument is based on a potential construction of Sections 551 and 552. They contend that if the spill was caused by a vessel not owned or controlled by the licensee for which the ship is destined, the board of arbitration will decide the issue of damages with only the Commission, the vessel causing the spill and the third person suffering harm as parties.[23] This determination of the amount of damages is final.[24] The terminal operator is made expressly liable for the acts of vessels destined for its facilities.[25] If the Commission cannot recover the expenditures from the Fund from the vessel, the matter may be turned over to the Attorney General for collection.[26]

Plaintiffs contend that in any such action brought against them the issue of damages is foreclosed by the decision of the board. They continue, since the Act makes no provision for the licensee to be a party at the board's hearing on damages, the procedure violates the right of the terminal operator to receive notice and a hearing on the issue of damages.

If the construction advanced by the plaintiffs is the only reasonable construction of Sections 551 and 552, a serious issue of procedural due process arises.

Notice and the opportunity to be heard are two essential elements of due process of law. Randall v. Patch, supra.

■ The duty of this Court is to determine if these provisions of the Act are susceptible of a reasonable interpretation which would satisfy constitutional requirements.

If there is such an interpretation, we are bound to adopt that interpretation as it sustains the statute. In re Stubbs, supra.

22. 38 M.R.S.A. § 551(3)(E).

23. 38 M.R.S.A. § 551(2).

24. 38 M.R.S.A. § 551(3)(E).

25. 38 M.R.S.A. § 552(1).

26. 38 M.R.S.A. § 551(6).

Section 551(3)(E) provides that determinations of the board as to third party damages shall be final. We must assume that the Legislature acted with knowledge of the constitutional requirements of due process. Martin v. Maine Savings Bank, 154 Me. 259, 147 A.2d 131 (1958). The board, in meeting the statutory purpose of establishing procedures whereby injured third parties may be promptly made whole,[27] *merely decides the amount to be paid out of the Fund to the aggrieved third party.*

It is this decision that is final, subject to review for abuse of discretion.

The decision binds the parties to the arbitration proceeding as to expenditures *from the Fund.*

The Commission is then directed, under Section 551(6), to seek reimbursement of the third party damages awarded plus the costs of clean-up, subject to certain limitations not here in issue. If reimbursement is not forthcoming, the Commission is directed to turn over the matter to the Attorney General for collection. Such collection is to be effected by an independent judicial proceeding.

The terms of the Act do not preclude the issue of the amount of recovery from being decided in a subsequent proceeding against one not a party to the hearing before the board.

We read the phrase "turned over to the Attorney General for collection" as a statutory direction for the state to seek full recovery for expenditures from the Fund, not as a mandate that the Court assess the amount of damages found by the board once the Court has decided the issue of causation.

Neither are we convinced that, as plaintiffs assert, Section 552 makes the damages assessed by the board binding on the Court. Plaintiffs cite

". . . the state need only *plead* and prove the fact of the prohibited discharge . . ." (Emphasis added)

as a legislative determination that damages (amount of reimbursement to the Fund) need not be proved.

The section is entitled "Liabilities of licensees." The subsection is headed "State need not plead or prove negligence." The use of the word "only" exempts the State from proving anything other than causation in order to establish liability. It does not require that causation be the single issue before the Court in the collection suit brought by the Attorney General.

Reading the section as a whole, we are convinced that the Legislature intended to provide that the State be required to plead and prove only the fact of the prohibited discharge *to establish liability.* It was never intended that there be no requirement that the State prove damages in the action before the Court.

We find, and therefore accept, that the Act is subject to a reasonable interpretation that provides the oil terminal operators with notice and an opportunity to be heard on the issue of damages in the independent suit for collection required by the Act.

*B. Substance*

Plaintiffs next argue that the Act violates the substantive due process guarantees of both the United States and Maine Constitutions. First, the imposition upon terminal operators of vicarious liability for the acts of vessels not owned or controlled by the operators is advanced as an unconstitutional taking. Second, it is asserted that the imposition of license fees upon terminal operators in order to finance a state-wide conservation effort deprives them of property without due process of law.

27. 38 M.R.S.A. § 541.

As to the first issue, plaintiffs concede that in some instances vicarious liability may be imposed without violating due process guarantees. Ownership of property and agency relationships are examples of instances where one person may be properly held liable for the acts of another.[28] Plaintiffs quite accurately point out that there exists a common thread in these cases; either in the exercise of a degree of control over the acting party by the person held liable or inasmuch as there is a voluntary relationship entered into by the parties. Absent such a "control relationship," plaintiffs argue that there can be no imposition of vicarious liability.[29] Therefore, as to Pipe Line and in some measure as to the oil companies the Act is claimed to be unconstitutional.[30]

We cannot agree because in our view the "control relationship" cases cited by plaintiffs are not an exhaustive list of instances where vicarious liability may be constitutionally imposed.[31]

In Atlantic Coast Line v. Riverside Mills, 219 U.S. 186, 31 S.Ct. 164, 55 L.Ed. 167 (1911), the Supreme Court was asked to determine the constitutionality of the Carmack Amendment.[32] By this amendment, a railroad receiving goods to be shipped over more than one rail line was held liable for damage to the goods occurring while the goods were in the hands of a subsequent carrier.

The contract for carriage entered into by the parties expressly exempted the initial carrier from any obligations once the goods passed beyond its line. The contract also specifically denied any agency between the initial and subsequent carriers. The subsequent carriers were, by the terms of

28. Young v. Masci, 289 U.S. 253, 53 S.Ct. 599, 77 L.Ed. 1158 (1933) (car owner liable for acts of one to whom he entrusted the car); Eiger v. Garrity, 246 U.S. 97, 38 S.Ct. 298, 62 L.Ed. 596 (1918) (vendor of liquor liable for harm caused by intoxicated purchaser).

29. Plaintiffs cite State v. A/S Nye Kristianborg, 84 F.Supp. 775 (D.C.1949) for the rule that an imposition of liability on a vessel irrespective of personal liability of the owner of the vessel is a violation of due process. The case involved a Maryland statute allowing an *in rem* action against a vessel for wrongful death. Under the statute the action might be maintained even though the vessel was under the compulsory control of a pilot or under the control of a charterer. The case held that such a statute could not be applied retroactively. It did not hold the statute to be unconstitutional as violating substantive due process. The same statute was applied, ten years later, in State v. Weyerhaeuser Steamship Company, 176 F.Supp. 664 (D.C.1959) and State v. A/S Nabella, 176 F.Supp. 668 (D.C.1959) without meeting any due process arguments.

30. Pipe Line does not own, charter, or have control of any of the vessels destined for its terminal. Since it is a common carrier it may not refuse to transport the oil tendered at its South Portland terminal. It has no possessory interest in the oil. The oil companies, in varying degrees, receive oil from vessels not owned, leased or controlled by them. Some of these terminals off-load oil owned by other companies. Thus Pipe Line, and to some extent the other plaintiffs, are held liable for acts of vessels in which they have no ownership interest and over which they exercise no control. Insofar as the Pipe Line is concerned, it engages in an involuntary relationship with the ships destined for its terminal because of its inability to refuse to off-load and transport the cargoes of these vessels.

31. In Beach v. Government of District of Columbia, 116 U.S.App.D.C. 68, 320 F.2d 790 (1963), petitioner contested, on due process grounds, his liability to the government for the expenses of his daughter's hospitalization. The daughter was emancipated, she was a twice married adult, but the Court found the statute valid because of the reasonableness of attaching legal significance to the natural bonds of consanguinity. In other words, the enforcement of a "moral duty." The states have imposed liability in similar cases on more distant relatives based on a "natural or moral duty."

32. Act of Jan. 29, 1906, ch. 3591, § 7, 34 Stat. 584.

the contract, the agents of the shipper. The Court indicated that:

"The general doctrine accepted by this court, in the absence of legislation, is, that a carrier, unless there be a special contract, is only bound to carry over its own line and then deliver to a connecting carrier." 219 U.S. at 197, 31 S.Ct. at 166.

Therefore both by the terms of the carriage contract and by the doctrines of common law the initial carrier could not be held liable for the acts of another. The effect of the Carmack Amendment then was to statutorily impress an agency relationship upon initial and subsequent carrier. As a result of this imposed agency relationship the statute made the initial carrier vicariously liable for the acts of subsequent carriers. The Supreme Court upheld this imposition of liability as a constitutionally authorized act of government.

The Court stressed the mutually advantageous relationship of the railroads. Although independently managed, they were cooperating in a profit-making enterprise. The Court saw no constitutional infirmity in imposing liability on one railroad for the acts of another in order to further a valid public policy. That policy was to facilitate recovery by a shipper who would be otherwise forced to determine on what line the damage to his goods occurred and maintain litigation in a distant forum.

The valid policy justified the imposition of vicarious liability.

The seeming inequity in holding one liable for the acts of another disappears when the "business association" is examined. The Court found that the railroads had the facilities and were free to institute procedures whereby, among themselves, primary liability could be accurately located. The Court further stated that because there existed the possibility that such a recoupment procedure might prove ineffective in certain instances was no reason to hold the Carmack Amendment invalid.

*Atlantic Coast Line* stands for the proposition that government, in furthering a valid policy, may constitutionally impress vicarious liability on one party to a "business association" for the acts of another party to that association, where the party held liable has the means, within the association, to ultimately place primary liability upon the party causing the loss.

In State ex rel. Nilsen v. Whited et al., 239 Or. 149, 396 P.2d 758 (1964), the Oregon Supreme Court was asked to declare a statute

". . . unconstitutional and void as a denial of substantive due process in that it is not within the power of the legislature to create a debt from one person to another without the consent of the person charged unless for some breach of contract, express or implied, or for some tort or crime . . . ."

The statute [33] was directed at persons holding a dispenser's liquor license. Such persons who operated an establishment where food is cooked and served would be held liable, within limits, for the wages owed to the individuals employed in the kitchen and dining facilities of that establishment. This liability was imposed even though, as in State ex rel Nilsen, the kitchen and dining facilities were operated as a separate business entity by a third person.

The Court upheld the statute without examining the type of relationship between the dispenser and the operator of the kitchen and dining facilities. The court made no finding of agency either express or implied. The liability furthered reasonable state purposes and as applied to one party to a business association for the debts of another party to that association, was not violative of substantive due process rights.

We find from these cases that there is no constitutional bar to the imposi-

33. Or.Rev.Stat. 652.335.

tion of vicarious liability upon one engaged in business, for the acts of a business associate, when both are engaged in a mutually beneficial relationship and there is, in the relationship, adequate opportunity to locate, among the business associates, the primary liability.

"In the absence of organic restraint, the legislature may for the general welfare of society impose obligations and responsibilities otherwise nonexistent; and the creation of such liability, even though imposed irrespective of fault or agency, is not violative of due process, if it rests on reasonable grounds of policy . . . ." 16A C.J.S. Constitutional Law §§ 630, p. 878.

The Supreme Court, in Lincoln Federal Labor Union et al v. Northwestern Iron & Metal Co. et al., 335 U.S. 525, 69 S.Ct. 251, 93 L.Ed. 212 (1949), commented on the role that the due process clause played in evaluating legislative enactments.

"This Court beginning at least as early as 1934, when the Nebbia [Nebbia v. People of State of New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940] case was decided, has steadily rejected the due process philosophy enunciated in the Adair [Adair v. United States, 208 U.S. 161, 28 S.Ct. 277, 52 L.Ed. 436]-Coppage [Coppage v. State of Kansas, 206 U.S. 1, 35 S.Ct. 240, 59 L.Ed. 441] line of cases. In doing so it has consciously returned closer and closer to the earlier constitutional principle that states have power to legislate against what are found to be injurious practices in their internal commercial and business affairs, so long as their laws do not run afoul of some specific federal constitutional prohibition, or of some valid federal law." 335 U.S. at 536, 69 S.Ct. at 257.

The issue to be decided then is whether or not there are any reasonable objectives which the Legislature reasonably sought to further by imposing vicarious liability upon the oil terminal operators for the acts or omissions of vessels destined for or departing from their piers. We find that such reasonable objectives exist, and that the imposition of vicarious liability was a reasonable method of furthering those objectives.

Two of the prime purposes of the Act are the speedy settlement of third party claims and the immediate clean-up of spills. Both objectives require the presence of a sufficient amount of money in the Fund to meet emergencies. The ongoing activities under the Act, research and development, administration, etc., also require that the Act be properly funded.

All of these objectives would be severely hampered if the Fund became depleted. A major oil spill could bring about this result. The Legislature, in contemplating such a turn of events, could reasonably have made the judgment that the most appropriate means of keeping the Fund at an operating level would be to allow an action for reimbursement against the oil terminal operator.

Requiring the Commission, in all instances, to proceed against the vessel might cause delays in the litigation. In fairness to third parties there is a six-month period after the spill in which damage claims may be filed. It is possible that in this six-month period the vessel will have departed and will no longer be subject to the jurisdiction of Maine or United States courts. The oil terminal operator does its business in Maine, is always amenable to suit, and therefore it could reasonably be expected that suit against the terminal operator would be more likely to maintain the Fund at an operating level than would suit against the vessel.[34]

34. Under the Act the Commission may first proceed against the vessel for reimbursement. The terminal operator is secondarily liable if no recovery is had from the vessel or liable in an initial recovery action if the vessel is not amenable to suit.

The second substantive due process argument is, that the act as a whole, takes the property of the plaintiffs exclusively, to fund a state-wide conservation process.

Plaintiffs rely on State v. Johnson, Me., 265 A.2d 711 (1970). That case is not controlling.

In *Johnson* a property owner challenged the constitutionality of the Wetlands Act.[35] Her property consisted of coastal wetlands of the type the Legislature sought to preserve for conservational reasons. The value of the land in the condition required by the Act was nil. Since the Act prohibited Mrs. Johnson from altering the land to increase its commercial value, this Court held that the State had taken her land within the meaning of the due process clause. Forcing Mrs. Johnson to relinquish any value her property might have, without compensation, in order to advance a public purpose was held constitutionally impermissible.

These plaintiffs have not experienced an unconstitutional taking merely because their profit margins may have been decreased. The United States Supreme Court recognized this when it stated, "many forms of regulation reduce the net return of the enterprise; yet that gives rise to no constitutional infirmity." Day-Brite Lighting, Inc. v. Missouri, 342 U.S. 421, 424, 72 S.Ct. 405, 408, 96 L.Ed. 469, 473 (1952).

There has been no showing here that the license fees imposed by the Act are ruinous or oppressive. No claim has been made that any terminal operator will be precluded from that occupation as a result of the license fees. Therefore the only due process limitations on the Act are those applied to the State's power to tax.

The limitations placed on the State's power to tax by the due process clause of the Fourteenth Amendment are extremely limited. Such was the statement of the Supreme Court in Wisconsin v. J. C. Penney Co., 311 U.S. 435, 61 S.Ct. 246, 85 L. Ed. 267 (1940).

"At best, the responsibility for devising just and productive sources of revenue challenges the wit of legislators. Nothing can be less helpful than for courts to go beyond the extremely limited restrictions that the Constitution places upon the states and to inject themselves in a merely negative way into the delicate processes of fiscal policy-making." 311 U.S. at 445, 61 S.Ct. at 250.

See also, Northwestern States Portland Cement Co. v. Minnesota, 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959).

"That test is whether property was taken without due process of law, or, if paraphrase we must, whether the taxing power exerted by the state bears fiscal relation to protection, opportunities and benefits given by the state. The simple but controlling question is whether the state has given anything for which it can ask return." 311 U.S. at 444, 61 S.Ct. 250.

The Court found that Wisconsin had granted J. C. Penney the "substantial privilege" of conducting its enterprise in the State, and thus the tax was supported by that privilege.

The imposition of a license fee upon those off-loading oil over the waters of the State of Maine is justified in a like manner.

The oil terminal operators enjoy a "substantial privilege" when they engage in such an activity, an activity made possible by the protections and advantages provided by government. To paraphrase Mr. Justice Frankfurter, the incidence of the license fee, as well as its measure, is tied to the activity which the State of Maine has made possible, insofar as government is the prerequisite for the fruits of civilization,

35. 12 M.R.S.A. § 4701 et seq. (1969).

for which we pay taxes. Wisconsin v. J. C. Penney, supra, 311 U.S. at 446, 61 S.Ct. 250.

In State of Maine v. Stinson Canning Co., 161 Me. 320, 211 A.2d 553 (1965), this Court decided the sardine tax was constitutional. This tax was a fixed amount levied on each case of sardines placed in the "channels of trade." [36] Concerning that tax we said:

"Every intendment must be made in favor of the validity of the law, if it appears that the means adopted are suitable to the end in view, impartial in operation, not unduly oppressive upon the individuals, and has a real and substantial relation to their purpose." 161 Me. at 323, 211 A.2d at 555.

The license fee and the Fund created thereby are eminently suited to protecting the State and its residents from the harm caused by oil spills.

Employing the State's power to tax for this admittedly public purpose satisfies the first requirement of *Stinson Canning Co.*

The requirement of impartiality we view to be a necessary element of equal protection and we shall deal with that issue infra.[37] That the license fee is not oppressive has already been decided.

The final requirement of *Stinson Canning Co.* is that the public purpose advanced by the taxing measure must bear a real and substantial relation to the business activity being taxed.

The activity here made subject to the license fee is the over-water transfer of petroleum products. The revenue derived under the Act is allocated to:

(1) the administration of oil pollution control activity;

(2) the research and development of more efficient pollution control facilities;

(3) manpower and facilities to effect speedy containment and clean-up of spills;

(4) pay the costs of certain spills caused by acts of God, war, or government;[38]

(5) pay the initial costs of spills that are promptly reported by licensees;[39] and

(6) the payment of the costs of "mystery spills."

Since the petroleum industry engages in an activity which is potentially harmful it could be required to provide the first three items which the Fund is designed to provide. The Legislature could reasonably have believed that a centralized administration and control program, supported by the license fees, would be more effective than allowing the industry to provide its own system for the prevention and control of oil pollution.

The fourth and fifth items provided by the Fund amount to an insurance program for the plaintiffs.

Because of the potential harm to the State's resources and residents and because of the benefits of prompt notice of a spill there is an evident public benefit. But each oil terminal operator also benefits by paying license fees based on his share of the

---

36. Hence, it was not an ad valorem tax. The license fee prescribed by the Coastal Conveyance Act is based on a flat rate per barrel of oil transferred, therefore it too has no relation to value. Fluctuations in the price of oil have no effect on the license fee.

37. The Sardine Tax was evaluated on both due process and equal protection grounds. State of Maine v. Stinson Canning Co., 161 Me. 320, 329, 211 A.2d 553, 558 (1965).

38. 38 M.R.S.A. § 551(7).

39. 38 M.R.S.A. § 551(6)B.

business, yet being protected from loss in the stated instances by the provision that such damages will be paid from the Fund.

The use of license fees to pay for the containment and cleanup of "mystery spills" and to compensate third persons harmed by such spills also bears a reasonable relationship to the business of bringing oil and petroleum products into Maine. It is a matter of record that the overwhelming bulk of oil and related products used in Maine is brought into the State by vessel.

The oil transportation industry also receives benefits from the treatment of "mystery spills" under the Act.

Prompt containment and cleanup of these spills, spills of flammable products, is a safety measure protecting the further transportation and off-loading of oil products.

Prompt settlement of third party damage claims arising from mystery spills benefits the oil transportation industry in its efforts to maintain good public relations.

For the foregoing reasons, we hold that neither payments by terminal operators for costs of spills for which they are vicariously liable nor payments by them as license fees violate the due process guarantees of the Maine and United States Constitutions.

### III Equal Protection

Plaintiffs also argue the Act violates their equal protection rights. They say:

(1) the greater liability placed upon licensees as compared to others becoming liable for oil spills constitutes "invidious" discrimination;

(2) the creating of a fund to insure speedy settlement of third party claims is a violation of equal protection under the Maine case law; and

(3) allowing the Commission to exercise "unfettered discretion" in the granting of waivers of reimbursement assures "unequal administration" of Section 551(7) of the Act.

We do not agree.

■■■ *Not* all differences in treatment result in a prohibited unequal application of the law. True, there can be no differences in treatment of persons under the law "except upon some reasonable differentiation fairly related to the object of regulation." Railway Express Agency v. New York, 336 U.S. 106, 112, 69 S.Ct. 463, 466, 93 L.Ed. 533 (1949) (Jackson, J., concurring).[40]

Our Court has made clear that a classification must not be arbitrary.

It must be based upon actual differences bearing a substantial relation to the public purpose sought to be advanced by such discrimination.

If a classification, although discriminatory, is based upon such differences, it is not a violation of equal protection guarantees. Wright v. Michaud, 160 Me. 164, 200 A.2d 543 (1964); York Harbor Village Corporation v. Libby, et al, 126 Me. 537, 140 A. 382 (1928).

■■■ Plaintiffs, as licensees under the Act, are subject to absolute liability for oil spills. 38 M.R.S.A. § 552. Since the Act prohibits all oil discharges upon State waters, any other person causing a spill would be subject to suit for costs of

---

40. We also note that the United States Supreme Court has struck down on equal protection grounds "economic" legislation, as is herein being considered, in only one instance. Morey v. Doud, 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957). Mr. Justice Frankfurter, in a dissenting opinion joined by Mr. Justice Harlan, cautioned that "In applying the Equal Protection Clause, we must be fastidiously careful to observe the admonition of Mr. Justice Brandeis, Mr. Justice Stone, and Mr. Justice Cardozo that we do not 'sit as a super-legislature.' " 354 U.S. at 475, 77 S.Ct. at 1355.

clean-up and related damage claims. Claims against nonlicensees would be based upon negligence, or in the case of vessels, unseaworthiness.

Plaintiffs, as licensees, urge that the imposition upon them of absolute liability, instead of liability based on fault imposed on other shore facilities and vessels constitutes "invidious discrimination." In other words, they say there are no actual differences related to the statutory objectives of the Act, between oil terminal operators on the one hand and vessels and other shore-based facilities on the other.

The shore-based facilities which are not required to obtain a license, and thereby do not become subject to the absolute liability provision of the Act, include facilities incapable of storing more than 500 barrels of oil; facilities not engaged in the off-loading of oil, and certain marinas.[41] These facilities are engaged in handling oil to such a limited extent that we believe the Legislature has refrained from requiring that they too be licensed because, as is the case of marinas under Section 545(3), the legislative finding indicated that the likelihood of *significant damage* due to spills from these sources is remote.

We cannot say that this finding is irrational.

Considering not only the potential *incidence* of spills but also the potential *magnitude* of such spills, we hold that distinctions drawn between oil terminal operators and other shore-based oil facilities are based on actual differences.

Since the purpose of the Act is the preservation of the State's seacoast, it is reasonable to impose a higher degree of liability upon those whom the Legislature has found to constitute a higher risk to that protected interest. Armour & Co. v. North Dakota, 240 U.S. 510, 36 S.Ct. 440, 60 L. Ed. 771 (1916).

In considering the alleged discriminatory treatment of plaintiffs as compared to the treatment of vessels not subject to liability without fault under the terms of the Act, it is necessary to further divide the class of vessels. We must consider vessels carrying oil only for internal uses separately from vessels transporting oil for delivery, i. e., tankers.

Vessels in Maine waters carrying oil for internal use only, could reasonably be found to create a lesser risk of a spill and undoubtedly may be found to create a risk of lesser magnitude. The yacht, the lobster boat, or even the larger commercial ships traveling in Maine waters cannot be seen to create the same risk of a major oil spill as does a tanker in Maine waters. Since a vessel with oil on board for internal purposes only constitutes a lesser risk, it may be treated differently consistent with equal protection guarantees. Armour & Co. v. North Dakota, supra.

The class of tankers must be further divided into those tankers merely passing through Maine waters and those carriers "destined for or leaving a licensee's facility."

Tankers merely passing along the coast of Maine, while posing a danger, are not engaged in the kind of activities which result in as grave a danger as those vessels in Maine waters for the purpose of off-loading oil. The act of bringing a large vessel into port, of navigating the hazards which arise as one nears land is a danger not posed by tankers merely traveling along sea lanes which pass through Maine waters. These vessels will not be engaged in the vessel-to-vessel or vessel-to-shore transfer of oil and hence will not expose the State and its inhabitants to the dangers inherent in that operation. We hold that factual differences relating to the dangers posed by tankers passing through Maine waters and the over-water transfer of oil by licensed facilities permit the imposition

41. 38 M.R.S.A. §§ 542(7); 545(3)(A).

of different standards of liability. Armour & Co. v. North Dakota, supra.

The remaining classes then are oil terminals on the one hand, and vessels going to or leaving a terminal. Plaintiffs assert that the peril, both in magnitude and probability, of a spill from one of these tankers and from a terminal are factually indistinguishable.[42] Therefore, the imposition of absolute liability upon the terminal and not upon the vessels going to or coming from a licensed facility is a violation of the Equal Protection Clause.

But in cases of spills caused by such vessels, the State may recover upon an absolute liability basis. This is true because the terminal is vicariously liable for spills caused by such vessels under the terms of the Act. This provision renders remote the likelihood of suits against tankers "destined for or leaving a licensed facility," since the State will always have jurisdiction over the terminals and may employ the absolute liability standard in suits against the terminals. The terminals can, in effect, impose the same liability upon these tankers through "hold-harmless" agreements. See the discussion of vicarious liability, supra.[42A]

The statute thus does not require discrimination on its face. Discriminatory enforcement of the statute may, of course, be attacked through an "as applied challenge." Since we have also found actual differences between oil terminals and other potential causes of oil spills, namely, vessels not "destined for or leaving" a terminal and other shore-based facilities, we find the discriminatory treatment not to be a violation of equal protection guarantees.

■ Plaintiffs' second equal protection argument is that the creation of a fund to insure the prompt payment of third party claims, when applied to isolated industries, is a procedure long held by this Court to violate the Equal Protection Clause. Plaintiffs rely on a series of cases dealing with Legislative attempts to assist milk producers in receiving compensation for their products.

The milk producer legislation used various mechanisms such as licenses, security bonds, and the requirement of semi-monthly payments to aid farmers in receiving, on a regular and guaranteed basis, payment for milk sold to milk processors.

In State v. Latham, 115 Me. 176, 98 A. 578 (1916), the first statute aimed at assisting milk producers in their financial relationship with milk processors was struck down on equal protection grounds. This Court could find no reason why milk producers should be so favored over producers of other products, or over those who perform services, in the collection of debts. The Court found no reason why milk processors and no other purchasers of goods or services should be thus constrained in the matter of payments.

Later variations of the basic plan, guaranteeing payment to milk producers, were struck down by this Court. See State v. Old Tavern Farm, Inc., 133 Me. 468, 180 A. 473 (1935); Opinion of the Justices, 157 Me. 152, 170 A.2d 652 (1961); Brew-

42. In fact, the plaintiffs contend that the magnitude and probability of a spill from such vessels is greater than from a terminal.

42A. In addition, we note that at the time this legislation was enacted, the Legislature might reasonably have perceived limitations against the imposition of absolute liability upon vessels under the Admiralty Clause. cf. American Waterways Operators, Inc. v. Askew, 335 F.Supp. 1241 (M.D.Fla.1971). Distinctions based upon power to act are not violative of the Equal Protection Clause. Matson Nav. Co. v. State Bd. of Equalization, 297 U.S. 441, 56 S.Ct. 553, 80 L.Ed. 791 (1936); Union Bank & Trust Co. v. Phelps, 288 U.S. 181, 53 S.Ct. 321, 77 L.Ed. 687 (1933). In light of the United States Supreme Court decision in Askew v. American Waterways Operators, Inc., 411 U.S. 325, 93 S.Ct. 1590, 36 L.Ed. 2d 280 (1973) it is clear that the power of the Legislature is not so restricted by the Admiralty Clause.

er's Dairy v. Dolloff, Me., 268 A.2d 636 (1970).

In these cases, we were considering governmental intervention in contractual relationships.

The concerned parties dealt with each other voluntarily. Within the relationship a farmer could make his own judgment about the desirability of dealing with a processor and about the financial soundness of a processor. In other words, there existed an opportunity for the farmer to protect his financial interests before he became a creditor.

In the instant case no such opportunity exists.

The third party harmed by an oil spill has no means of preventing such losses. There are no precautions which a person may take to insure that the one causing the loss will make him whole. It is evident that requiring guarantees of payments arising from contractual relations is not comparable to requiring guarantees of payment occasioned by a tort.

The risk of spills and the magnitude of the potential harm from such spills, was found by the Legislature to be so grave as to require the establishment of a fund to insure prompt payment of third party claims.

We cannot say that the failure of the Legislature to require a fund to insure prompt payment of claims from all industrial accidents is a violation of equal protection guarantees.

Suffice it to say that the distinction drawn by the Legislature on the basis of the potential harm from accidents in the handling of oil on Maine waters is not invalid.

Plaintiffs next argue that the waiver procedure set out in Section 551(7) of the Act gives the Commission complete discretion and thus assures the unequal administration of that portion of the Act in violation of equal protection guarantees.

It is contended that once a person liable for a spill proves that such spill was the result of a cause for which right to reimbursement to the Fund may be waived, the Commission has no standards upon which to base the granting or the denial of such waiver.

If this were the only construction which could be given Section 551(7), the absence of standards might raise a "delegation without standards" issue.[43]

If some may and some may not enjoy privileges provided by the State, the decision to grant or withhold cannot be made in an arbitrary manner. Rosenblum, et al v. Griffin, 89 N.H. 314, 197 A. 701 (1938). If classes are established, they can, of course, be justified only by a "rational basis" test.

We do not construe this Section in such a manner as to raise the issue put forth by plaintiffs.[44]

43. See the opinions of Mr. Justice Weatherbee and Mr. Justice Wernick in City of Biddeford v. Biddeford Teachers Association, et al, Me., 304 A.2d 387 (1973).

44. The equal protection argument advanced by plaintiffs is inapposite. They rely upon Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). Yick Wo involved an ordinance facially attacked as permitting arbitrary and capricious action in violation of the Due Process Clause.

"In the present cases we are not obliged to reason from the probable to the actual, and pass upon the validity of the ordinances complained of, as tried merely by the opportunities which their terms afford, of unequal and unjust discrimination in their administration." 118 U.S. at 373, 6 S.Ct. at 1072.

The Court declined to rule on the due process issue because it was evident that the administration of the statute violated equal protection guarantees.

**26**

■ There is no question that the procedure [the Commission makes findings after hearing] in determining whether or not the spill was the result of excusable causes comports with due process requirements. Plaintiffs read the words "may, after hearing, waive the right to reimbursement" in the introductory portion of Section 551(7) to grant the Commission unbridled discretion in ordering waiver. However, the concluding portion of that Section begins:

> *"Upon such finding* by the Commission immediate credit *shall therefor be entered* for the party involved." (Emphasis added)

The latter language is clearly not permissive. Rather, it directs that reimbursement be waived upon a finding that the spill was the result of an act of God, act of war or act of government.

We construe the introductory phrase ". . . may, after hearing, waive . . ." to place *the decision as to whether or not the cause was excusable,* within the fact-finding responsibility of the Commission. We construe the latter phrase to *require* a waiver of reimbursement once exculpatory causation is found.

The language of the section which creates confusion and which, it could be reasonably argued, lends support to the plaintiffs' position is as follows:

> "The findings of the Commission shall be conclusive as it is the legislative intent that the waiver provided in this subsection is a privilege conferred not a right granted."

We read the section as a whole, giving effect to all the words contained therein.

As we have indicated above, it was clearly the Legislature's intention to make

the Commission's finding of fact unreviewable. Such provisions are very often found in the field of administrative law. See for example, 39 M.R.S.A. § 99. See also, 20 M.R.S.A. § 216. McGary v. Barrows, 156 Me. 250, 262, 163 A.2d 747, 754 (1960).

The rationale is that an administrative agency develops an expertise as a fact-finder and its findings of fact are made expressly not subject to review.

A fair reading of the language of the section does not, in our view, permit the interpretation that once the Commission has found as fact that the spill resulted from either an act of war, an act of government or an act of God, the Commission is vested with discretion to grant or withhold the waiver of the right to reimbursement to the Fund.

The words "upon such finding by the Commission immediate credit therefor shall be entered for the party involved" make it clear that the Legislature's intention was that the word "may" appearing in the first paragraph ["may after hearing"] should be construed as mandatory. See: The Inhabitants of Monmouth v. The Inhabitants of Leeds, 76 Me. 28, 31 (1884); Furbish v. County Commissioners, 93 Me. 117, 131, 44 A. 364, 368 (1899).

■ In summary we interpret Section 551(7) as designed to accomplish four things:

(1) It gives jurisdiction to the Commission to entertain a petition filed with it by "the person determined to be liable for reimbursement to the Fund" for abatement of the costs under subsection 6.

(2) It authorizes the Commission to hold hearings to decide whether or not the occurrence was the result of an act of war,

"For the cases present the ordinances in actual operation, and the facts shown establish an administration directed against a particular class . . . ." 118 U.S. at 373, 6 S.Ct. at 1073. *Yick Wo* does not compel us to predict that the Commission will act in an

arbitrary and capricious manner. Since the statute has not been applied nor is there evidence that it was designed to discriminate against a particular class, plaintiffs' claim is without merit.

an act of government, either State, Federal or municipal, or an act of God.

(3) It provides that the finding of fact in this issue made by the Commission shall be conclusive, and

(4) It directs that in the event the Commission finds as fact that the occurrence was the result of an act of war, or an act of government or an act of God, it shall immediately enter credit therefor for the party involved.

The jurisdiction to hear and decide is granted by the use of the words "may after hearing waive."

The words describing the standards governing the Commission as to whether or not such waiver shall be granted are "if the Commission finds that the occurrence was the result of any of the following:

A. An act of war.

B. An act of government, either State, Federal or municipal.

C. An act of God, which shall mean an unforeseeable act exclusively occasioned by the violence of nature without the interference of any human agency."

The language directing the Commission to act after finding exculpatory causes is "upon such finding by the Commission *immediate credit therefor shall be entered* for the party involved."

The words "is a privilege conferred not a right granted" found in the last sentence of the section, apparently are intended to explain why the Legislature made the findings of the Commission conclusive.

We do not construe such words as indicating an intention on the part of the Legislature to give the Commission unbridled discretionary power to grant or withhold the waiver once it has found the cause of the occurrence to be either an act of war, an act of government, or an act of God.

## IV Jury Trial

In cases where plaintiffs are being held liable for their own acts, they will be involved in the initial arbitration proceeding to determine third party damages.

Plaintiffs argue that the determination of the amount of damages made in arbitration will be res judicata in a subsequent reimbursement suit. Thus, in these cases, plaintiffs will not be entitled to have a jury decide the amount of damages.[45]

This failure is argued to be a violation of the jury trial guarantees of Article I, Section 20, of the Maine Constitution.

The State contends that a determination of third party damages in such cases does not violate plaintiffs' rights to a jury trial. In support of this position, the State relies on an examination of the history of "Mill Acts" in Maine.[46]

The first Mill Act affecting the liability of owners of dams in Maine was enacted in colonial times. Act of February 22, 1713–1714, ch. 15, §§ 2–3, 1 Province of Mass. Bay Acts & Resolves 729–30 (1869). It was there provided that:

"... If any person or persons find themselves agrieved and damnified in their propriety of lands, by its being flowed by the owner or occupant of such mill[s] stopping or raising the water, that, in every such case, the party so damnified in his propriety, [*upon*] [making] application for relief to the court of general sessions of the peace in the

45. In instances where plaintiffs' liability is vicarious, the damage finding of the arbitration board would not be res judicata in the reimbursement suit if the plaintiff had not been a party to the arbitration. See the discussion of procedural due process, supra.

46. See the discussion of the rights of mill owners in Bean v. Central Maine Power Co., 133 Me. 9, 11–14, 173 A. 498, 498–500 (1934).

county where such mills or pond is, the said court be and hereby are empowered to issue out a warrant, directed to the sheriff of the same county, to summon and impanel a jury of good and lawful men, at the proper cost and charge of the owner or owners of such mill or mills; and the jury shall be sworn by a justice of [the] peace, to a faithful, indifferent appraisal of the yearly damage done to [the] [any] person complainant, by flowing his or their land as aforesaid.

"And the jurors' verdict, being returned by the hand of the sheriff to the next court of quarter sessions of the county where such mill or pond is, being allowed and recorded, shall be a sufficient bar against any action to be brought for any damages occasioned by the flowing of any such lands as aforesaid . . . ."

Substantially similar provisions were enacted in Massachusetts after it became a State. Acts of 1795, ch. 74, § 2, [1794–5] Laws & Resolves of Mass. (1896).

This was the law of Maine when the *Constitutional Convention on October 29*, 1819, adopted Article I, Section 20, guaranteeing the right to trial by jury "in all controversies concerning property . . . except in cases where it has heretofore been otherwise practiced."[47] A statutory procedure existed, in lieu of an action at common law, whereby a jury would decide the issue of damages resulting from construction of a mill dam. Although the right to have such damages assessed by a jury existed when the jury trial section of the Constitution was adopted, and would have existed at common law in the absence of statute, that right did not become one of constitutional dimension. That is, Article I, Section 20, did not guarantee that the determination of damages from flowage would always be an issue for the jury.[48]

By P.L. [1824] ch. 261, § 1, the Legislature directed the County Comissioners to determine the flowage damages and report to the Court. This report was subject to impeachment before the jury. In two early cases involving required parties, the Court ruled that the Mill Act procedure contained features of a suit at law and aspects of a suit in equity, but the procedure was basically one in equity. Hill v. Baker, 28 Me. 2 (1848); Moor v. Shaw, 47 Me. 88 (1860).

By P.L. [1856] ch. 269, § 1, the Legislature provided that the Commissioners' report on damages could be impeached only if "misconduct, partiality, or unfaithfulness on the part of some commissioner is shown." This, in effect, removed the issue of damages from jury consideration. In Ingram v. Maine Water Co., 98 Me. 566, 57 A. 893 (1904), this provision was challenged as a violation of petitioner's right to a jury trial. The Court relying on Hill v. Baker and Moor v. Shaw, held that the statutory procedure was in the nature of an eminent domain proceeding. The Court then stated:

"In a complaint for flowage there are some elements of a suit at law. (Citations omitted). But there are others which might be only within the jurisdiction of a process in equity. The damage already sustained, which might be determined by an action at law, is not the full measure of compensation which the landowner is entitled to receive. There are yearly damages thereafter and damages in gross to be assessed.

"A careful examination of authorities satisfies us that it is not a case where, as a matter of right, a party is entitled to a trial by jury. The claim for damages is not a civil suit or a controversy concerning property within the meaning of the

---

47. 1 Maine Laws 24 (1821).

48. The Maine Legislature did, however, enact P.L. 1821, Ch. 45, § 4, which provided for "a jury of twelve good and lawful men" to determine yearly flowage damages and precluded any common law actions to recover such damages.

Constitution." 98 Me. at 573, 57A at 894.

*Ingram* stands for the proposition that if an action at common law for damage to property is abolished, and if a statutory procedure, equitable in nature, is substituted whereby those damages may be recovered, jury trial as a matter of right is not a necessary incident of the statutory procedure.

■■■ As previously noted, the Mill Act was substituted for an action at law in Maine before the adoption of the Constitution. Should Ingram be limited to statutory procedures in effect prior to the adoption of the Constitution? We think not.

The language of *Ingram* does not dictate such a result. The focus is upon the nature of the statutory procedure, not upon the nature of the abolished procedure. The Legislature is empowered to abolish existing causes of action and to create others. It would serve no purpose to make the date of such actions the determinative factor in whether or not the right of trial by jury exists in the newly created cause of action. This determination should be based solely on the nature of the new cause of action. If, under the holding of *Ingram,* this new cause of action includes features that render it equitable in nature, there is no requirement of a jury trial as a matter of right.

■■■ But the State's argument fails at this point. The procedure whereby third party damages are determined, paid from the Fund, and then recovered back in a reimbursement suit does not sound in equity. Merely inserting the Fund as a middleman in what would otherwise be a suit for damages against the terminal operator does not alter the fact that the procedure is one at law, a procedure, consequently, which must provide for a jury determination of facts as a matter of right.

■■■ Although the State agrees with plaintiffs' interpretation of Section 551

(3)E, making the determination of third party damages by the board of arbitrators binding in the subsequent reimbursement suit, this is not the only possible interpretation. The word "final" appearing in the section applies to the determination of the amount to be paid by the State Treasurer from the Fund to third party claimants. The entire scheme of arbitration is directed at speedy payment of claims of property damage and loss of income. The object is to provide funds immediately so that private persons may institute "clean up" measures on their property and so that these persons will not have to endure protracted legal proceedings while they are being deprived of their livelihoods or use of their property due to the spill.

■■■ Whereas the "final" decision of the board of arbitration fixes the amount to be paid to injured third parties from the Fund, the reimbursement suit fixes the amount of a licensee's obligation to the Fund. The Court hearing the reimbursement suit is not bound by the determination of the board.

We note that reimbursement is not the sole means of replenishing the Fund. Any variance between the third party damages awarded by the board of arbitration and the liability of the licensee determined in the reimbursement suit could be recovered through the license fees imposed by the Act.

Such a variance would then be classed as an unreimbursed expense, similar to costs of "mystery spills" and clean-up costs for which reimbursement is waived.

If the Court hearing the reimbursement suit followed this latter course, a licensee would be provided with an opportunity for a jury determination of the entire amount of its liability to the Fund.

We conclude that Section 551(3)E making the determination as to the amount of damages by a majority of the board of arbitrators final, relates only to the amount to be paid to the injured third parties from

the Fund. The finding by a majority of the board is not binding in the reimbursement suit in any court. In such reimbursement suit a licensee against whom such suit is instituted is entitled to a jury determination of the amount of its liability to the Fund.

*V Separation of Powers*

Article III of the Maine Constitution provides for the creation of three separate and distinct branches of government with the further provision that powers vested in one branch may not be exercised by a person or persons of another branch.

Plaintiffs contend that the board of arbitrators, which decides upon the amount of third party damages to be expended from the Fund, is in effect an administrative body performing a judicial function in violation of Article III.

Under the Maine Workmen's Compensation Act, the Industrial Accident Commission is empowered to make final determinations of fact, including the determination of damages. Plaintiffs, citing Mailman's Case, 118 Me. 172, 106 A. 606 (1919), attempt to distinguish this analogy on the grounds that the compensation statute is elective. Employing plaintiffs' logic, parallel bodies for hearing disputes of law, one existing in the administrative branch and one in the judicial branch, would be constitutionally permissible only if persons were allowed to elect the forum in which they chose to proceed.

This is not the holding of Mailman's Case.

The reference to the fact the Workmen's Compensation Act is elective was used by the Court to demonstrate that no violation of the right to jury trial existed. It is obvious that if two forums exist, one of which affords the right to a jury trial, and if the forums are elective, a litigant cannot claim that he has been denied the right to a trial by jury.

The concern of the doctrine of separation of powers is not whether a person may enter a forum of the judicial branch at his will, but whether a person with a dispute requiring judicial authority for resolution may be afforded only a forum that is not part of the judicial branch.

The issue then becomes: does the determination of third party damages require an exercise of judicial authority; or may a quasi-judicial tribunal, an administrative agency, perform the fact finding function as a necessary incident to the attainment of that agency's statutory responsibility?

Plainly, the latter is true. See Pomponio v. State, 106 N.H. 273, 209 A.2d 733 (1965); 1 Davis, Administrative Law, § 1.-09 (1958).[49]

Part of the Commission's function is the speedy payment of third party damage claims. As an incident to that function it is reasonable to allow the Commission[50] to

---

49. At page 68 of his treatise, Professor Davis states, "The danger is not blended power. The danger is unchecked power." Assuming this view, the "incident to agency function" rationale for quasi-judicial administrative acts, so often relied upon by the courts becomes unnecessary. If the sole, practical role of the separation of powers doctrine is to provide a check against one branch of government usurping all governmental powers, it is sufficient protection for the judiciary to have the power to review determinations of quasi-judicial bodies.

50. We note that plaintiffs continually characterize the Commission as the body making the determination of damages. This is a misstatement. The board of arbitrators is selected, equally, by the Commission and the person determined to have caused the spill. Section 551(3). Strictly speaking then, the tribunal is not an administrative agency. The board of arbitrators, although selected by the parties, is analogous to the board of Commissioners, appointed by the Court, under the Mill Act. For purposes of the separation of powers doctrine it seems im-

make factual findings as to the extent of those damages.

No issues of liability or of negligence or other "judicial" issues are resolved.

The arbitrators make only factual findings.

 This process does not violate the separation of powers doctrine of Article III.

## VI Import-Export

As previously noted, Pipe Line offloads petroleum products of foreign origin for the sole purpose of introducing those products into its line for shipment to Canada. Several of the remaining plaintiffs offload fuels of foreign origin, some of which is destined for use by aircraft and vessels departing from Maine in international traffic.

Plaintiffs assert that the imposition of the one-half cent per barrel transfer charge upon these products is a violation of the Import-Export Clause of the Constitution.[51]

Article I, Section 10, Clause 2 of the United States Constitution provides:

> "No State shall, without the Consent of Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its Inspection Laws . . . ."

It prohibits a state from exacting *any* impost or duty. The single exception is set out in terms, "absolutely necessary," which reinforces the intention that the clause is to be an absolute prohibition.

The constitutionality of the one-half cent per barrel license fee imposed upon terminal operators depends upon the answers to three questions:

Is the license fee an impost or a duty?

Is the license fee imposed "on" imports or exports?

Is the oil, at the time the fee is imposed, an import or an export?

 Treating the latter question first, we find that under decided law, the oil is an import when the license fee is imposed. Because the petroleum products come to Maine from foreign points of origin, the prohibition of the Import-Export clause is applicable. Woodruff v. Parham, 75 U.S. (8 Wall) 123, 19 L.Ed. 382 (1869).

Since Brown v. Maryland, 25 U.S. (12 Wheat.) 419, 6 L.Ed. 678 (1827), the Supreme Court has steadfastly maintained a mechanistic approach in deciding when the prohibition of the Import-Export Clause ceases and the power of the state to tax arises. The "original package" and related doctrines are the result of literal interpretations of the prohibition. The absolute prohibition has left little room for judicial construction as to what types of imposts or duties may or may not be permissible as well as little room to determine what is and what is not an impost. See Youngstown Sheet & Tube Co. v. Bowers, 358 U.S. 534, 79 S.Ct. 383, 3 L.Ed.2d 490 (1959), (Frankfurter, J., dissenting).

It has been suggested that the rigidity of the Supreme Court's refusal to examine the purpose of the Import-Export Clause in determining when charges are forbidden as imposts and when they are permissible

---

material whether the fact finder is appointed by the Court pursuant to the statutory directive of the Mill Act (admitted by plaintiffs to be unobjectionable to Article III), or whether the fact finder is jointly selected by the parties pursuant to a statutory directive of the Coastal Conveyance Act.

51. Pipe Line also claims immunity from the payment of duties under 19 U.S.C. § 1553 which states in pertinent part:
"Any merchandise . . . shown . . . to be destined to a foreign country, may be entered for transportation in bond through the United States by a bonded carrier without appraisement or the payment of duties . . . ."

as taxes is open to attack. See Note, State Taxation of Imports—When Does an Import Cease to Be an Import? 58 Harv.L. Rev. 858, 867–76 (1945).

This Court is, of course, not the proper forum for that attack.

■ We must apply the rule that imports are free from imposts and duties until they are opened, sold, or until they are used by the importer. Brown v. Maryland, supra; Hooven & Allison Co. v. Evatt, 324 U.S. 652, 65 S.Ct. 870, 89 L.Ed. 1252 (1945); Youngstown Sheet & Tube Co. v. Bowers, supra.

■ The transfer fee is imposed upon oil which, at the outset, is an import under Woodruff v. Parham and which has not ceased to be an import by reason of use or sale.[52] Therefore, the imposition of the transfer fee must be evaluated under the Import-Export Clause.

Plaintiffs argue that the fee, although imposed on the act of transferring oil over water, is imposed "on Imports or Exports" within the meaning of the Import-Export Clause.

In Fairbank v. United States, 181 U.S. 283, 21 S.Ct. 648, 45 L.Ed. 862 (1901), a federal stamp tax on bills of lading for goods being exported was held to violate Article I, Section 9, Clause 5, of the United States Constitution.[53] The Court stated:

"If all exports must be free from national tax or duty, such freedom re-

quires, not simply an omission of a tax upon the articles exported, but also a freedom from any tax which directly burdens the exportation . . . ." 181 U.S. at 293, 21 S.Ct. at 652.

A tax on charter parties was struck down because it tended to "obstruct or hinder" the export process. United States v. Hvoslef, 237 U.S. 1, 35 S.Ct. 459, 59 L. Ed. 813 (1915).

In Thames & Mersey Ins. Co. v. United States, 237 U.S. 19, 35 S.Ct. 496, 59 L.Ed. 821 (1915), the Court, in striking down a stamp tax on marine insurance policies covering exports, stated that

"The rise in rates for insurance as immediately affects exporting as an increase in freight rates, and the taxation of policies insuring cargoes during their transit to foreign ports is as much a burden on exporting as if it were laid on the charter parties, the bills of lading or the goods themselves." 237 U.S. at 27, 35 S.Ct. at 499.

Plaintiffs contend that the test of whether or not a duty is imposed "on Imports or Exports" is the effect of that duty on the import-export process. If the result of the duty is a direct burden, an obligation imposed in effect on the goods, then that duty is "on Imports or Exports."

Mr. Chief Justice Marshall, in Brown v. Maryland, wrote that

"'a duty on imports,' then, is not merely a duty on the act of importation,

---

52. Even if the oil offloaded at the Pipe Line's pier has ceased to be an import, it has at that time been introduced into the export process, i. e., delivered to a common carrier to be shipped outside the United States. Richfield Oil Corp. v. State Board of Equalization, 329 U.S. 69, 67 S.Ct. 156, 91 L.Ed. 80 (1946). As an export it is free from impost or duty levied by either the State or Congress.

53. That clause provides:
"No tax or duty shall be laid on Articles exported from any State."

The prohibition is directed against the federal government but inasmuch as it is an absolute prohibition and concerns exports, it is similar to the limitation placed upon the States by Article I, Section 10, Clause 2. The cases construing "on" exports under Article I, Section 9, Clause 5, are applicable when construing that term under Article I, Section 10, Clause 2, Richfield Oil Corp. v. State Board of Equalization.

but is a duty on the thing imported." 25 U.S. (12 Wheat.) at 437–438.

In Canton R. R. Co. v. Rogan, 340 U.S. 511, 71 S.Ct. 447, 95 L.Ed. 488 (1951), the Supreme Court distinguished a tax on the "goods from one imposed upon the handling of them" at the port. The railroad was being taxed on receipts from the leasing of a crane used for the loading and unloading of exports and imports. The Court upheld the tax against a challenge based upon the Import-Export Clause.

> "An article may be an export and immune from a tax long before or long after it reaches the port. But when the tax is on activities connected with the export or import the range of immunity cannot be so wide." 340 U.S. at 514–515, 71 S.Ct. at 449.

The Court was careful to distinguish the facts in that case from the facts now before us. The railroad was not actively involved in the loading or unloading of the vessel. Therefore, the question now before us [fees imposed on the actual offloading of oil] was specifically left open.

A second example of taxes upon the handling of imports or exports upheld against a constitutional attack based upon the Import-Export Clause is seen in Inter-Island Steam Nav. Co. v. Territory of Hawaii, 96 F.2d 412 (9th Cir. 1938). Hawaii had imposed a tax upon the receipts of the plaintiff, a common carrier. The plaintiff was engaged in intra-territorial shipping which included the carriage of goods which had been imported or were to be exported. The Court held the taxes were constitutionally imposed.

> "The fees are not laid on the property imported or exported, on the proceeds thereof, or on the privilege of importing or exporting. The fact that appellant must pay a fee based on receipts from transporting articles imported and exported by others, has only an indirect

and remote effect, if any, on the imports and exports." 96 F.2d at 419–420.

The question of taxes imposed upon the gross receipts of a stevedoring company was before the Court in Joseph v. Carter & Weekes Stevedoring Co., 330 U.S. 422, 67 S.Ct. 815, 91 L.Ed. 993 (1947). The majority opinion rested upon the Commerce Clause. Three dissenters reached the Import-Export issue. Mr. Justice Douglas, joined by Mr. Justice Rutledge, concluded that such a tax was prohibited as an impost on imports or exports. Mr. Justice Murphy concluded the tax was not imposed "on Imports or Exports."

Determining whether or not a tax is imposed "on Imports or Exports" is not simply a matter of determining whether or not the tax affects or enhances the ultimate cost of the goods. This is apparent from the holding of Canton R. R. Co. v. Rogan, supra. The language used in Fairbank, Hvoslef, and Thames & Mersey Ins. Co., i. e., "directly burdens," "affects," and "obstruct or hinder," indicates a judicial attempt to formulate a rule for determining which taxes are imposed on the goods, not an attempt to draw taxes on activities relating to the importation or exportation into the prohibited zone of the Import-Export Clause.

██ The history of that clause evidences a continued strict and literal application of its terms. If a tax is imposed on activities relating to the goods, rather than upon the goods themselves, that tax is, by the terms of the Constitution, not sufficiently direct to fall "on Imports or Exports" within the intendment of that clause.

 The license fee imposed by the Act now before us, is imposed upon the offloading of oil rather than upon the oil itself. The license fee is completely unrelated to the value of the oil. It may be argued that the fee is imposed directly on the goods rather than on the activity of off-

loading because it is based upon volume.[54] But although volume is not an unusual method of taxing goods, it is here an accurate gauge of the activity being taxed.

It is also of importance that the volume of oil offloaded is directly related to the danger that the Act seeks to guard against.

This present view of the tax as it will at first be applied is limited to short range application. Over the long run the tax is not related to volume but strictly to the hazard of overwater oil transportation.

When the Fund reaches the statutory limit, the imposition of the tax is ended.

Administrative and research costs and unreimbursed cleanup costs may cause collection of the tax to be resumed periodically. The imposition of a charge upon the offloading of oil, over the long run, bears no relationship to either *value* or *volume of imported oil* and are thus not fees imposed "on Imports or Exports." [55]

■ The State urges that the license fee is not an impost or a duty under the Import-Export Clause. The prohibition of that clause, as of any constitutional provision must be determined by ascertaining the purpose of its provisions. Cook v. Pennsylvania, 97 U.S. (7 Otto) 566, 24 L. Ed. 1015 (1878).

The State's first contention is that only "general revenue measures" are proscribed as imposts or duties. This position is supported by the statement of the purpose of the Import-Export Clause found in Youngstown Sheet & Tube Co. v. Bowers, supra.

"The design of the constitutional immunity was to prevent '[t]he great im-

porting States [from laying] a tax on the non-importing States,' to which the imported property is or might ultimately be destined, which would not only discriminate against them but also 'would necessarily produce countervailing measures on the part of those States whose situation was less favourable to importation.'" 358 U.S. at 545, 79 S.Ct. at 389. (quoting from Brown v. Maryland, supra.)

On the other hand, at the Constitutional Convention, a Mr. Clymer proposed that the prohibition against the imposition of duties upon exports by Congress be limited by inserting the phrase "for the purpose of revenue" after the word "duty." This proposal was voted down. Fairbank v. United States, supra. The Court, in *Fairbank*, stated that

"... it is clear that the framers of the Constitution intended not merely that exports should not be made a source of revenue to the national government, but that the national government should put nothing in the way of a burden upon such exports." 181 U.S. at 292–293, 21 S.Ct. at 652.

■ We think the same type of limitation was intended to be placed upon the power of the states to tax by the Import–Export Clause. The deciding factor in determining whether a fee is a prohibited impost or duty is not whether the tax is a general revenue measure, but whether the tax is a "burden" upon imports or exports.

Accordingly, the State's second argument is that the Act, and its taxing provision, constitute a regulatory scheme of pollution control which provides definite benefits to

---

54. "Where . . . the tax is measured by the property imported or exported, or by its proceeds, it is an impost in effect if not in form."
Citroen Cars Corp. v. City of New York, 30 N.Y.2d 300, 306, 332 N.Y.S.2d 882, 887, 283 N.E.2d 758, 761 (1972).

55. We deny Pipe Line's claim under 19 U.S.C. § 1553. That statute prohibits the appraisement or the imposition of duties upon bonded goods brought into the United States solely for export. The statute does not by its terms nor has it been construed to prevent a state from taxing activities related to the transhipment of such goods.

shippers and handlers of oil. And further, since the regulatory scheme does afford plaintiffs such a benefit, in overall effect the Act is not a burden upon the import or export of oil and thus not a duty or an impost.

▮ In Morgan's S.S. Co. v. Louisiana Bd. of Health, 118 U.S. 455, 6 S.Ct. 1114, 30 L.Ed. 237 (1886), the Supreme Court had before it a Louisiana statute which provides that all vessels passing a certain quarantine station on the Mississippi River be required to pay certain fees. These fees were to be used to support and administer the inspection and quarantine process established by the statute. The plaintiff steamship Company attacked the imposition of fees as a violation of the Constitution.[56]

The Court recognized that the purpose of the Louisiana statute was

". . . *the protection of the state,* and especially of New Orleans . . . from infectious and contagious diseases which might be brought there by vessels . . .." 118 U.S. at 458, 6 S.Ct. at 1115 (Emphasis added)

The Court perceived the danger to the State which the Legislature sought to guard against and recognized that protection against that danger was a valid subject of the State's police power.

Most importantly, in deciding that the quarantine fee was not a duty, the Court realized that the scheme provided a benefit to the steamship company.

". . . the vessel itself has the primary and deepest interest in this examination . . . . It is obviously to her interest . . . that she enter the city and depart from it free from . . . suspicion . . . . This she obtains

by the examination and can obtain in no other way. If the law did not make this provision for ascertaining her freedom from infection, it would be compelled to enact more stringent and more expensive penalties against the vessel herself . . . and throwing the responsibility for this on the vessel, the heaviest punishment would be necessary by fine and imprisonment . . . . The State now says you must submit to this examination. . . . For this examination . . . you must pay. The danger comes from you, and though it may turn out that in your case there *is* no danger, yet as you belong to a class from which all this kind of injury comes, you must pay for that examination. . . ." 118 U.S. at 461–462, 6 S.Ct. at 1117.

The Maine Act is strikingly similar.

The Legislature has perceived a danger from massive oil spills.

It is acting through its police power to protect the State.

The danger of such spills comes from oil carriers and the Legislature has sought to prevent this danger and has imposed the cost of the preventive measures upon those creating the danger.

The imposition of these costs is essential to provide services which are in the best interests of plaintiffs. The prompt containment of oil spills will prevent or lessen damages caused by the spill. Such rapid reaction benefits plaintiffs inasmuch as it prevents or decreases their liability. The prompt containment of spills will also prevent disruption of shipping and acts to ameliorate dangers to shipping from uncontrolled spills. The Act provides for prompt settlement of damage claims and thereby facilitates amicable relations be-

---

56. The fee was attacked as a "duty" prohibited by the so-called tonnage clause. Article I, Section 10, Clause 3, of the United States Constitution provides that

"No State shall, without the Consent of Congress, lay any Duty of Tonnage."

This clause was designed to supplement the import-export clause, and the term "duty" in each clause has the same meaning. See Cooley v. Board of Wardens of the Port of Philadelphia, 53 U.S. (12 How.) 299, 313, 13 L.Ed. 996 (1851); Clyde Mallory Lines v. Alabama, infra.

tween oil carriers and other users of the sea or shoreline. It is also significant that this minimal intrusion into the operation of the licensees has been enacted in lieu of much harsher civil or criminal penalties which might be enacted to control the peril of massive oil spills. These real benefits inherent in the Act totally negative the argument that the license fee is a burden upon imports or exports.

Similar reasoning was adopted in Clyde Mallory Lines v. Alabama, 296 U.S. 261, 56 S.Ct. 194, 80 L.Ed. 215 (1935). The State imposed *"harbor fees."* These fees were used to support the policing of the port, to control the movement of vessels and to protect against hazards created by the uncontrolled discharge of oil into the harbor. The statute, enacted in the interest of the State, provided affirmative benefits to those subject to the tax. The Court held that these fees were not a burden, not a duty prohibited by the Constitution.

Plaintiffs' reliance upon Dept. of Revenue v. James Beam Co., 377 U.S. 341, 84 S.Ct. 1247, 12 L.Ed.2d 362 (1964), is misplaced. The incidence of the Kentucky tax was the privilege of importing liquor into the State.

The license fee imposed by the Maine Act is not imposed upon all importers of oil and is thus not a privilege tax.

The Act does not impose any liability on those who seek to import oil by truck, rail or pipeline.

The license fee imposed by the Act is specifically directed to one activity, the *over-water transfer of oil.*

Unlike the Kentucky importers of liquor who were required to pay the fees for the privilege of importing and could not escape the fee if liquor was brought into Kentucky, the Maine importers of oil have alternate means of importation which allow them to escape the license fee.

■ We hold that plaintiffs' challenge to the Act based upon the Import-Export Clause must fail for two reasons. First, the license fee is not imposed *"on Imports or Exports."* Because the transfer fee is imposed on an *activity* related to the importation of oil *rather than on the property imported*, the fee is not sufficiently direct to be "on Imports" under Article I, Section 10, Clause 2.

Second, the license fee is not a duty or impost since the overall effect of the Act is the establishment of a regulatory scheme for controlling oil pollution which is essential to protect the public interest and affords benefits to those subject to the license fee.

## VII Commerce

■ Plaintiffs' challenge of the Act under the Commerce Clause[57] is in two parts. The most extensive argument concerns the constitutionality of the one-half cent per barrel license fee imposed by the Act. Plaintiffs also contend that the regulatory scheme for controlling oil pollution, and particularly the imposition of absolute and vicarious liability upon terminal facilities, constitutes an impermissible burden upon foreign and interstate commerce.

Before deciding the validity of the license fee imposed by the Act it will be helpful to determine what type of tax it is.

The license fee is not a general revenue measure.

Neither is it a tax on income or gross receipts.

It is not a tax on the privilege of shipping oil into the State of Maine.

It is not a tax upon goods in interstate or foreign commerce.

The license fee is imposed upon *the act of transferring oil over water.*

---

57. Article I, Section 8, Clause 3, of the United States Constitution states that "Congress shall have Power . . . to regulate Commerce with foreign Nations and among the several states . . . ."

This act is admittedly a step in interstate or foreign commerce. However, this act is the culmination of a process, i. e., the carrying by vessel of oil into the ports of the State, which the Legislature has determined exposes the State and its residents to a threat "of great danger and damage." This threat, "of potentially catastrophic proportions," is a result of the interstate and foreign commerce subjected to the license fee. The fund established by the collection of the license fees is to be applied *solely* to the administration of a program to prevent such a catastrophe and, in the event a spill should occur, to enable the speedy containment, clean-up, and resolution of damage claims.

In short, the Legislature did not enact the license fee as a tax measure to support State government, but as an adjunct to a scheme of regulation enacted under the State's police power.

 Those engaged in interstate commerce are not exempted from the taxing power of the states. McGoldrick v. Berwind-White Coal Min. Co., 309 U.S. 33, 60 S.Ct. 388, 84 L.Ed. 565 (1940).

". . . it was not the purpose of the commerce clause to relieve those engaged in interstate commerce of their just share of state tax burdens, merely because an incidental or consequential effect of the tax is an increase in the cost of doing the business . . . ." 309 U.S. at 46, 60 S.Ct. at 392.

*McGoldrick* limits the type and extent of state taxes in terms of unconstitutional burden, but that case, as are most state tax cases, is concerned with a general revenue measure.

The test for a taxing measure incorporated as part of a "police power" regulation requires a different formulation of the "burden test" from that employed to evaluate the kind of taxes before the Court in *McGoldrick*.

Included in the "just share" of state tax burdens imposed on interstate commerce is the cost of preventing and remedying harm caused by a danger inherent in the interstate commerce being taxed.

In Dean Milk Co. v. City of Madison, 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951), the Supreme Court had before it a Commerce Clause challenge to a local milk ordinance. The ordinance, in effect, prohibited the sale of milk in the City of Madison that did not come from farms within a 25 mile radius of the City and which had not been pasteurized at a plant within 5 miles of the City. Such a prohibition favoring a large local industry discriminated against interstate commerce.

But the Court did not end its inquiry with the finding of discrimination.

Since the avowed purpose of the ordinance was insuring that unwholesome milk would not be sold in Madison, the Court looked to see if "reasonable and adequate alternatives" were available. Id. at 354, 71 S.Ct. 295. It was only after such alternatives were found that the ordinance was declared unconstitutional.

What is significant to the issue now before this Court is one of the "reasonable and adequate alternatives" advanced by the Supreme Court.

"If the City of Madison prefers to rely upon its own officials for inspection of distant milk sources, such inspection is readily open to it without hardship for it could charge the actual and reasonable cost of such inspection to [those engaged in interstate commerce]." 340 U.S. at 354–355, 71 S.Ct. at 298.

The Legislature has adopted this alternative.

Oil pollution is certainly a danger which can be reached under the State's police power.

Maine has not prohibited the interstate commerce that gives rise to the peril but has instead instituted a scheme of regulation to alleviate the effects of such peril upon the State and its inhabitants.

The cost of this regulation scheme has been imposed upon those engaged in the commerce in the form of a license fee.

Similar charges upon interstate and foreign commerce have been approved by the Supreme Court. The administration of harbor policing performed at the port of Mobile with the costs of such administration charged to those using the port was upheld in Clyde Mallory Lines v. Alabama, supra. The cost of a quarantine and inspection to prevent the admission of diseases into the City of New Orleans was, under Louisiana law, imposed upon the vessels bringing passengers or crew into the port. This charge was upheld in Morgan v. Louisiana, supra. See also Cooley v. Board of Wardens of the Port of Philadelphia, 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1851).

Although the State is justified in imposing a license fee upon those engaged in such a hazardous undertaking, because that undertaking is a step in interstate and foreign commerce the license fee is subject to constitutional limitations. The proper test for a charge upon interstate and foreign commerce to guard against a hazard inherent in that commerce, should be the same test applied to determine if charges imposed upon interstate and foreign commerce for use of facilities provided by the State constitute an impermissible burden.

Privilege taxes imposed upon interstate commerce for use of state facilities have been upheld in numerous instances. A flat fee levied upon users of a state's highways was constitutionally applied to interstate commerce in Morf v. Bingaman, 298 U.S. 407, 56 S.Ct. 756, 80 L.Ed. 1245 (1936). See also Hendrick v. Maryland, 235 U.S. 610, 35 S.Ct. 140, 59 L.Ed. 385 (1915). Similar charges for the use of airport facilities imposed upon interstate commerce were upheld in Evansville-Vanderburgh Airport Auth. Dist., et al. v. Delta Airlines, Inc., et al., 405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972).

The Court in *Delta* required state charges to "reflect a 'uniform, fair and practical standard' relating to public expenditures." The amount of the tax was examined to determine if it fairly approximated the use or privilege for which it was imposed.

In the case now before us, we will examine the license fees imposed by the Act to insure that interstate and foreign commerce is being charged an amount which uniformly and fairly reflects the necessary state expenditures to guard against the danger inherent in the commerce being taxed.

*Delta* sets out a three-pronged test of constitutionality.

First, the tax must not discriminate against interstate and foreign commerce. The license fee imposed by the Act does not so discriminate. While the majority of oil transferred over Maine waters is in interstate or foreign commerce, the license fee is also imposed upon transfers resulting from intrastate shipment.

Second, the license fee must "reflect a fair if imperfect approximation" of the conduct which gives rise to the danger against which the Act seeks to guard. The license fee is not imposed upon *all* over-water transfers of oil. Marinas fueling vessels of 75 feet or less in overall length, where the purchaser and consumer of the fuel are the same entity, and storage facilities with a capacity of no more than 500 barrels are exempted from paying the license fee.[58]

The legislative finding that as to the facilities

"... the likelihood of significant damage to marine, estuarine and terrestrial environment, due to spills of oil, petroleum products ... is remote due to the limited nature of their operations and the small quantities stored ...." (38 M.R.S.A. § 545(3))

---

58. 38 M.R.S.A. § 545(3); 38 M.R.S.A. § 542(7).

is a rational distinction in light of the purposes of the Act. The license fee is based upon the amount of oil transferred to any given terminal and is thus directly related to the dangers posed by the activities of that terminal.

Third, those engaged in interstate and foreign commerce have the burden of proving that the license fees collected are "excessive" in relation to costs incurred by the taxing authorities. Since there is no experience under the Act from which the amount of money necessary to accomplish the purposes of the Act can be established and since the plaintiffs have given us no factual basis for their claim the fees are excessive, the plaintiffs have failed to sustain their burden.

We cannot, as a matter of law, find that the $4,000,000 limit of the Fund is irrational in light of the catastrophic damages which may be caused by an oil spill.

We do not know at this time the amount necessary for administration of the Act. Nor can we predict the degree to which clean-up costs and third party damage awards will go unreimbursed. We do know that expenditures for research and development are limited to $100,000 per annum and that whatever amount is expended for this purpose must be approved by the Legislature.[59]

It is sufficient, for the present, to say that the proposed expenditures from the Fund appear necessary to attain the stated objectives of the Act.

Since the amount of license fees collected is directly related to the actual expenditures under the Act, we cannot say that the taxes imposed are "excessive."

■ The prior discussion indicates to us that the Commerce Clause in and of itself does not forbid the imposition of a license fee upon interstate and foreign commerce involved in the over-water transfer of oil.

■ A second issue is the potential conflict between state action relating to interstate and foreign commerce and federal legislation enacted under the Commerce Clause. As is more thoroughly discussed *infra* under the Admiralty Clause, the Water Quality Improvement Act not only does not prohibit, but authorizes state initiatives to control the evil of oil pollution. Since the Federal Act authorizes state action, we conclude that Congress did not intend to prohibit the states from imposing otherwise constitutional taxes upon interstate and foreign commerce to give effect to the state action.

Plaintiffs' second Commerce Clause contention is that the regulatory system imposed by the Act is in conflict with federal law thus destroying the required uniformity of controls upon interstate and foreign commerce.

The imposition of a state regulatory scheme is itself an impermissible burden they say.

We recognize that certain aspects of commerce must, because of the need of uniformity, be subject solely to the power of Congress. Cooley v. Board of Wardens, supra. The states are precluded from legislating regulations in such areas even though Congress has failed to act. The entire area is reserved to federal control under the so-called "dormant" Commerce Clause.

Early in our history the Supreme Court distinguished instances where the states were precluded from exercising power by the dormant Commerce Clause and instances where the states were free to regulate unless those regulations came in conflict with federal law. Willson v. Black Bird Creek Marsh Co., 27 U.S. (2 Pet.) 245, 7 L.Ed. 412 (1829). The Court held in *Cooley* that the distinction turned upon whether the subject which the state sought to regulate was a national or a local concern. See Southern Pacific Co. v. Arizo-

---

59. 38 M.R.S.A. § 551(1); 38 M.R.S.A. § 555.

na, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945).

The issue of whether regulations promulgated under the state's police power seeking to protect the state's inhabitants from environmental pollution may be applied to those engaged in interstate commerce was before the Supreme Court in Huron Portland Cement Co. v. City of Detroit, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960). The City had adopted a smoke abatement ordinance and sought to enforce the penal provisions of that ordinance against shippers admittedly engaged in interstate commerce.

The Court discussed without "extended discussion" the contention that such an ordinance was precluded by the dormant Commerce Clause.

The Detroit ordinance did not discriminate against interstate commerce and there was no showing that national uniformity was required to prevent inconsistent local regulations.

The Maine Act does not discriminate in favor of the intrastate commerce and plaintiffs have advanced nothing to show that compliance with Maine's regulations will place plaintiffs in the dilemma facing the truckers in Bibb v. Navajo Freight Lines, Inc., 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959).

The issue once again becomes a question of whether or not the regulations advanced by the state are in conflict with federal law. In *Huron* the Court found that Congress recognized the primary responsibility of state and local governments to prevent air pollution. The federal laws did not purport to be an exercise of police power.

This situation now before us is similar.

Congress has, in the Water Quality Improvement Act, exercised police power but it has also specifically declared that it did not intend to preempt the field.

■ In the light of this Congressional encouragement of state action, and because

the regulations and liability imposed upon oil terminals under the Act are not otherwise unconstitutional, we hold that no conflict exists between the Act and federal law.

Since neither the license fees nor the regulations and liability provisions of the Act constitute an impermissible burden, plaintiffs' challenge under the Commerce Clause must fail.

*VIII Admiralty*

Plaintiffs contend the Act unconstitutionally abridges Article III, Section 2, Clause 1, of the United States Constitution. That clause provides:

"The judicial Power shall extend . . to all Cases of admiralty and maritime jurisdiction."

It is asserted that the Act "purports to make radical changes in substantive maritime law."

■ The Admiralty Clause does not permit either Congress or the States to deprive the Federal Courts of admiralty jurisdiction. Panama R.R. Co. v. Johnson, 264 U.S. 375, 44 S.Ct. 391, 68 L.Ed. 748 (1924). This Court has recognized as much in Warren v. Kelley, 80 Me. 512, 15 A. 49 (1888). See also, Berry v. M. F. Donovan & Sons, 120 Me. 457, 115 A. 250 (1921).

38 M.R.S.A. § 551(2)D provides that claims arising under the Act shall be recoverable only in the manner provided by the Act and that the remedies provided to those harmed by oil spills under the Act are to be "exclusive."

■ The doctrine of presumptive constitutionality of statutory enactments is given full effect in challenges based on the Admiralty Clause. Huron Portland Cement Co. v. Detroit, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960); Davis v. Dept. of Labor, 317 U.S. 249, 63 S.Ct. 225, 87 L.Ed. 246 (1942).

Applying this presumption, we do not find that the Legislature intended to preclude those injured by oil spills from seeking relief in a Federal Court.

Section 551 nowhere refers to Federal Courts.

 We hold that the Legislature intended to act within its constitutionally limited area of power. The forum provided by the Act, the board of arbitration established by Section 551(3), is intended to be the "exclusive" *state* forum for resolving damage claims arising from oil spills.

 Plaintiffs next contend that, although the arbitration procedure is the sole *state* forum available for the resolution of oil spill damages and that those injured by oil spills are free to seek relief in a Federal Court, the concurrent state remedy is not "saved to suitors"[60] because it is not "a common law remedy."

The relief granted to suitors under the Act is a monetary award based upon damages and is the traditional form of relief at common law.

It is the method of determining damages, i.e., by a board of arbitration rather than by a judge or a jury, to which plaintiffs object.

Plaintiffs rely upon Southern Pacific Co. v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917). In *Jensen* an employee was killed while engaged in the unloading of his employer's steamship. The Workmen's Compensation Commission of New York awarded funeral expenses and periodic compensation to the widow and two children of the deceased. This compensation was related by formula to the deceased's weekly wage.[61] The Commission's award was based upon absolute liability and was predicated upon the "arising out of" and in "the course of" requirements of the Workmen's Compensation statute.

While the *Jensen* Court was concerned with the absolute liability issue, such issue is not relevant to the specific question now before us. We are here concerned only with the state forum and procedure and will discuss substantive issues *infra*.

The Court in *Jensen* held:

"The remedy which the Compensation Statute attempts to give is of a character wholly unknown to the common law, *incapable of enforcement* by the ordinary processes of any court and is not saved to suitors from the grant of exclusive jurisdiction." (Emphasis added) 244 U.S. at 218, 37 S.Ct. at 530.

The remedy provided by the New York statute required an application of a system of damages unknown to the common law. It also required continuing jurisdiction of the Commission because the awards were to be altered or ceased in the event of certain contingencies. What seems of foremost importance is that the remedy provided by the State of New York could not have been provided by an admiralty court.

The remedy provided by the Act to those harmed by oil spills is not like the remedy in *Jensen*.

The remedy is provided by determining actual damages.

---

60. The grant of admiralty jurisdiction to the federal courts was not exclusive. A duality of admiralty jurisdiction was created by the Judiciary Act of 1789. (Now 28 U.S.C. § 1933.) The savings clause permitted suitors to receive ". . . all other remedies to which they are otherwise entitled."

The savings clause allowed states to exercise jurisdiction concurrent with the admiralty courts of *in personam* actions such as that provided by the Act. Red Cross Line v. Atlantic Fruit Co., 264 U.S. 109, 44 S.Ct. 274, 68 L.Ed. 582 (1924).°

61. The New York statute before the Court in *Jensen* is fully described in New York Central R.R. Co. v. White, 243 U.S. 188, 37 S.Ct. 247, 61 L.Ed. 667 (1917).

The relief is afforded by a lump sum payment. This remedy, a typical common law remedy could easily be enforced by an admiralty court.

Neither the savings clause nor the holding of *Jensen* were concerned with the nature of the forum. The concern was, rather, that the remedy offered to suitors by the state was not of a type, "known to the common law," a remedy which an admiralty court could enforce.

Since the remedy provided by the Act is one that is enforceable in an action in a common law court, it falls within the savings clause. Panama R.R. Co. v. Vasquez, 271 U.S. 557, 46 S.Ct. 596, 70 L.Ed. 1085 (1926).

Even if *Jensen* were construed to forbid states affording a common law remedy in a forum not known to the common law, it appears that holding has been limited to the specific facts of that case. *Jensen* has no remaining vitality beyond that which may continue as to State Workmen's Compensation laws. Standard Dredging Corp. v. Murphy, 319 U.S. 306, 63 S.Ct. 1067, 87 L.Ed. 1416 (1943). In *Standard Dredging* the Court refused to extend *Jensen* into the area of state unemployment insurance.

The State urges that in the wake of the confusion caused by *Jensen,* the Supreme Court has interpreted the savings clause in a manner so as to accommodate state and federal interests. The touchstone of the analysis is the federal interest in a uniform law of admiralty. See, Standard Dredging Corp. v. Murphy, supra, and Davis v. Dept. of Labor, supra.

In Romero v. International Terminal Operating Co., 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959), the court stated that

" . . . if one thing is clear it is that the source of law in saving-clause actions cannot be described in absolute terms. Maritime Law is not a monistic system. The State and Federal Governments jointly exert regulatory powers to-

day as they have played joint roles in the development of maritime law throughout our history." 358 U.S. at 374, 79 S.Ct. at 481.

No federal interest is infringed upon by the creation of a board of arbitration to decide those damage questions presented in a state forum.

On the other hand, the State's objective of providing prompt resolution of those claims is a valid interest, inasmuch as it facilitates the rapid clean-up of private property and provides support to those whose means of employment have been destroyed as a result of an oil spill.

For these reasons the plaintiffs' claim that the Act seeks to divest the federal courts of admiralty jurisdiction, and that the Act has established a procedure of arbitration for resolving damage claims which is not authorized by the "savings clause," must fail.

 It is the position of the plaintiffs that the Act creates *substantive* admiralty law which is either novel or which conflicts with existing admiralty law.

The permissible role of the states in creating substantive maritime law was recently considered in Askew v. American Waterways, 411 U.S. 325, 93 S.Ct. 1590, 36 L.Ed.2d 280 (1973). Relying upon Just v. Chambers, 312 U.S. 383, 61 S.Ct. 687, 85 L.Ed. 903 (1941) and The City of Norwalk, 55 F. 98 (S.D.N.Y.1893), the Court stated the law to be that

" . . . a State, in the exercise of its police power, may establish rules applicable on land and water within its limits, even though these rules incidentally affect maritme affairs, provided that the state action 'does not contravene any acts of Congress, nor work any prejudice to the characteristic features of the maritime law, nor interfere with its proper harmony and uniformity in its international and interstate relations.' " 411 U.S. at 339, 93 S.Ct. at 1599.

The contention that the state may not create "new" [62] maritime law is untenable.

The role of state created rights and obligations in the maritime area was discussed at length in Romero v. International Terminal Operating Co., supra.

"Although the corpus of admiralty law is federal in the sense that it derives from the implications of Article III evolved by the courts, to claim that all enforced rights pertaining to matters maritime are rooted in federal law is a destructive oversimplification of the highly intricate interplay of the States and the National Government in their regulation of maritime commerce. It is true that state law must yield to the needs of a uniform federal maritime law when this Court finds inroads on a harmonious system. But this limitation still leaves the States a wide scope." 358 U. S. at 373, 79 S.Ct. at 480.

Included in this "wide scope" is the establishment of a state regulatory system and the imposition of absolute liability upon these plaintiffs to protect Maine's coast from this "insidious form of pollution." Askew v. American Waterways.

The Court there stated that

"Historically, damages to the shore or to shore facilities were not cognizable in admiralty." 411 U.S. at 340, 93 S.Ct. at 1599.

Suits to recover such damages were brought within the scope of admiralty jurisdiction by the enactment, in 1948, of the Admiralty Extension Act. (46 U.S.C. § 740). The Supreme Court considered that Act in Victory Carriers, Inc. v. Law, 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971). The Court held that the exclusive jurisdiction of the Federal Courts in admiralty should not be extended beyond that extended by the framers of the Constitu-

tion unless Congress clearly states such an intention.

In considering the effect of the Admiralty Extension Act upon an oil conveyance law similar in many respects to the Maine Act, the Askew Court stated that

" . . . sea-to-shore pollution—historically within the reach of the police power of the State—is not silently taken away from the States by the Admiralty Extension Act, which does not purport to supply the exclusive remedy." 411 U.S. at 343, 93 S.Ct. at 1601.

The rigid requirement of uniformity stated in Jensen and Knickerbocker Ice Co. v. Stewart, 253 U.S. 149, 40 S.Ct. 438, 64 L.Ed. 834 (1920), was held not to preempt state action in the area of controlling oil pollution.

The opinion of the Court in Askew has resolved the question of whether or not the regulations and absolute liability imposed upon terminals violates the uniformity requirement of the Admiralty Clause against plaintiffs.

The issue raised here that was not before the Court in Askew is whether the imposition of vicarious liability upon plaintiffs is barred by the need for uniformity.

Plaintiffs cite Somes v. White, 65 Me. 542 (1876), for the proposition that vicarious liability may not be applied in maritime law. In Somes this Court refrained from adopting, for reasons of policy, a form of vicarious liability upon an owner of a ship. The fact that our Court did not believe that public policy required the adoption of vicarious liability on the facts before it in Somes is no basis for deciding that a legislative policy decision on different facts cannot stand.

Plaintiffs' argument seems to be, [relying upon Jensen and Knickerbocker Ice Co.] that uniformity of admiralty law is an end in and of itself.

---

62. Plaintiffs contend that the imposition of strict liability and the imposition of vicarious liability upon terminal operators is doctrine foreign to generally accepted principles of admiralty law.

In our view of the cases, uniformity is required only when there is a *national* interest at stake.

Plaintiffs have cited no *national* interest which would be affected by the imposition upon oil terminals of vicarious liability. On the other hand the state interest in having an entity over which it can exercise jurisdiction in recovering costs and damages resulting from oil spills is both practical and compelling.

The imposition of vicarious liability does no violence to any *federal* interest and thus does not offend the uniformity requirement of the Admiralty Clause.

Since the Act does not violate the dormant Admiralty Clause, plaintiffs' claim of substantive violation of admiralty law must fail unless they can demonstrate that the Act conflicts with specific federal enactments.

Plaintiffs contend that the Act is inconsistent with existing maritime law and thus violates the Admiralty Clause. They also contend that the Act is inconsistent with other Congressional enactments in violation of the Supremacy Clause.[63]

We shall treat these alleged conflicts with federal law individually.

Plaintiffs recognize that the "presently operative" Congressional enactment in this area is the Water Quality Improvement Act of 1970.[64] This Act was discussed at length by the Supreme Court in *Askew*. The Court upheld the waiver of preemption contained in the Federal Act.[65] This waiver allows the states to impose unlimited, strict liability on terminals for "losses suffered both by the State and by private interests." Since the Federal Act contemplated State-Federal cooperation, the Court held that the recovery of Federal clean-up costs did not preclude the State from recovering the moneys it expended in clean-up operations.

The *Askew* decision left two questions unanswered. They are:

"whether the amount of [clean-up] costs [recoverable by a State] . . . are limited to those specified in the Federal Act and whether in turn this new Federal Act removes the pre-existing limitations on liability in the Limitation of Liability Act . . . ."[66]

Plaintiffs argue that inasmuch as the Act provides no limit on the amount of clean-up costs recoverable by the State, it conflicts with the limit established in the Federal Act. Section 1321(*o*) of the Federal Act limits the liability of an onshore oil facility for costs of federal clean-up procedures to an amount not to exceed eight million dollars.

The Federal Act refers specifically to *federal* clean-up costs.

In light of the contemplated federal-state cooperation in containing and cleaning-up oil spills, it is unlikely that if such a joint effort resulted in the Federal Government spending eight million dollars, that Congress intended the State to go unreim-

---

63. United States Constitution, Article VI, Clause 2.

64. 33 U.S.C. § 1321 et seq.

65. 33 U.S.C. § 1321(*o*) provides that:

"(1) Nothing in this section shall affect or modify in any way the obligations of . . . any owner or operator of any onshore facility or offshore facility to any person or agency under any provision of law for damages to any publicly owned or privately owned property resulting from a discharge of any oil or hazardous substance or from the removal of any such oil or hazardous substance.

"(2) Nothing in this section shall be construed as preempting any State or political subdivision thereof from imposing any requirement or liability with respect to the discharge of oil or hazardous substance into any waters within such State.

"(3) Nothing in this section shall be construed . . . to affect any State or local law not in conflict with this section."

66. 46 U.S.C. § 181 et seq.

bursed. The Senate Committee took care to point out that no provision of the Federal Act should be read to affect the right of a state to establish "absolute liability *without limits*" for oil discharges. S.Rep. No. 91–351, 91st Cong., 1st Sess. 20 (1969). (Emphasis added.) The conference report on this issue declared that a state is "free to provide requirements and penalties similar to those imposed by this section or additional requirements and penalties." H. R.Rep. No. 91–940, 91st Cong., 2d Sess. 42 (1970).

 We hold that Congress did not intend to restrict the states to the eight million dollar limit imposed on reimbursement of federal clean-up costs.

The Legislature has not created a conflict with the Federal Act by failing to so limit liability under the Act.[67]

 This conclusion also resolves plaintiffs' contention that the Act conflicts with the Water Quality Improvement Act by providing fewer defenses to a reimbursement suit.

The State waives reimbursement of the costs of its clean-up operation in instances where the spill is the result of an act of God, war or government.

The Federal Act waives reimbursement when the spill is the fault of third persons.

The Maine Act, in addition, imposes vicarious liability upon an oil terminal for spills caused by vessels destined for or departing from that terminal. We believe the waiver of preemption found in 33 U.S. C. § 1321(*o*) is broad enough to allow the State to impose liability in instances where liability is not imposed by the federal law. That provision when construed with the

statements of Congressional intent, cited *supra*, indicates to us that Congress left the states free to devise whatever standards of liability were deemed necessary to realize the State's objectives.

Since the liability imposed by the Act does not violate due process it is a valid legislative act not in conflict with the federal statute.

 Plaintiffs next contend that the Act, inasmuch as it does not limit the liability of vessels, is in conflict with the federal Limitation of Liability Act.[68] The liability of owners of vessels is limited to the "value of such vessels and freight pending." 46 U.S.C. § 189. This limitation extends to damages caused by oil spills even when the injury is to the shore. Richardson v. Harmon, 222 U.S. 96, 32 S.Ct. 27, 56 L.Ed. 110 (1911).

We note that the Act, *by its terms*, does not provide for unlimited liability. In fact the Act does not seek to define the limits of the liability of vessels. It merely states that they "shall be liable . . . for all costs of clean-up or other damage incurred by the State." 38 M.R.S.A. § 552(2).

This language is identical to that contained in the Florida Act before the Supreme Court in *Askew*. (Fla.Stat. § 376.-12, F.S.A.).

 The State acknowledges in its brief that any suits against vessels for reimbursement, whether in a state or federal forum, must be decided by applying fixed maritime law. This would include, of course, an application of federal liability limits.[69]

Plaintiffs argue that the regulatory powers of the Commission under 38 M.R.S.A.

---

67. Plaintiffs also claim that the license requirement of the Act conflicts with the Water Quality Improvement Act. This claim was decided adversely to plaintiffs in *Askew*.

68. Plaintiff oil companies assert that they have standing to raise this issue because

many of the vessels carrying oil to Maine ports are owned by them.

69. If the Commission seeks to impose unlimited liability upon vessels, the question reserved by the Supreme Court in *Askew* will be raised.

§ 546(4) attempt to set up a "conflicting, inconsistent and duplicative" system of regulation.

Plaintiffs' burden in this instance is a heavy one.

■ They must show "repugnance or conflict . . . between the federal and state regulations" such that these provisions cannot "be reconciled or consistently stand together." Kelly v. Washington, 302 U.S. 1, 58 S.Ct. 87, 82 L.Ed. 3 (1937).

■ The one specific conflict set forth by plaintiffs concerns the establishment of anchorage areas by the Commission. The pertinent federal law directs the Secretary of Transportation to define anchorage grounds when required by "maritime or commercial interests." This power was granted to the Secretary in 1915. 38 Stat. 1053.

As yet no anchorage grounds have been designated in Maine by the Secretary of Transportation.

This is hardly a "repugnance or conflict" which cannot be reconciled.

In any event, the regulations promulgated by the Commission render plaintiffs' argument on this point moot. Article XII of those regulations provides:

"In the case of any conflict of these regulations with Federal Law or with a mandatory rule, regulation or order fo (sic) the Federal Government or its agencies, such Federal Law, rule, regulation or order shall govern." [70]

In light of this provision a facial attack of conflict with federal regulations must fail.

■ Plaintiffs' final contention is that the Act interferes with the conduct of foreign affairs and conflicts with international treaties.

The supremacy of the federal government in the area of foreign affairs is unquestioned. Hines v. Davidowitz, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941).

When the federal government has by treaty established rights and obligations, the treaty is the supreme law of the land.

No state can add to or take from the force and effect of such treaty. Missouri v. Holland, 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920). We have recognized as much in Opinion of the Justices, 155 Me. 141, 152 A.2d 173 (1959).

The 1954 International Convention for the Prevention of Pollution of the Sea by Oil [71] allows certain discharges of oil, i. e., to save a life or to secure the safety of the vessel. Plaintiffs urge that the Act, by imposing liability for all spills, contravenes the terms of the treaty.

However, Article XI of the treaty makes plain the intent of the Convention not to affect rules governing territorial sea.

That Article provides that nothing in the Convention should be construed as derogating from the powers of any of the parties to take measures *within its jurisdiction* concerning matters to which the Convention relates.[72] In ratifying the Convention, the United States specified that its acceptance was subject

"to the understanding that Article XI effectively reserves to the parties to the Convention freedom of legislative action in *territorial* waters . . . anything in the Convention which may appear to be contrary notwithstanding." [1961] 3 U.S.T. 3024 T.I.A.S. 4900. (Emphasis added)

This freedom of action was granted to the states by Section 11 of the Water Quality Improvement Act.

70. State of Maine Environmental Improvement Commission Oil Discharge Prevention and Pollution Control Regulations, XII (adopted December 11, 1970, effective December 26, 1970).

71. [1961] 3 U.S.T. 2989, T.I.A.S. 4900 as amended by [1966] 2 U.S.T. 1523, T.I.A.S. 6109.

72. [1961] 3 U.S.T. 2998, T.I.A.S. 4900.

The issue then becomes whether the jurisdiction of the Commission extends only to territorial waters.

38 M.R.S.A. § 544(1) extends the jurisdiction of the Commission 12 miles from the coastline of the State.

This plaintiffs claim is an overreaching of the 3-mile limit historically recognized by the United States.

In State v. Ruvido, 137 Me. 102, 15 A.2d 293 (1940), this Court said, quoting Commonwealth v. Manchester, 152 Mass. 230, 240, 25 N.E. 113, 116 (1890):

"We regard it as established that as between nations the *minimum* limit of a nation over tide waters is a marine league [3 miles] from its coast . . . . " (Emphasis supplied)

In State v. Richardson, Me., 285 A.2d 842 (1972), we stated in reference to *Ruvido* that

"By this principle the Court decided that the territorial waters over which Maine has jurisdiction and sovereignty embraces a three mile limit." 285 A.2d at 844 n. 3.

Since the United States has by treaty reserved the right to legislate in territorial waters alone, and has entered into an international agreement concerning the seas beyond its territorial waters, the freedom of the State of Maine to act in this area is limited to that area considered by the United States to be within its territory.[73]

Our attention has not been called to a provision of any treaty, Act of Congress, or decision of the Supreme Court of the United States, limiting territorial jurisdiction of the United States to tidewaters within 3 miles of the coast of the United States.

Our research has disclosed no such provision.

This being so, we cannot say the provision of this statute which extends jurisdiction over tidewaters to a point 12 miles from the Maine coast is invalid.

We have carefully examined the provisions of 38 M.R.S.A. §§ 541–557, to determine whether or not, as the plaintiffs contend, the Act or any part thereof offends against either the Constitution of the State of Maine or the Constitution of the United States. While doing so, we have been mindful of the words of Mr. Justice Story, written for a unanimous Court, in Martin v. Hunter's Lessee, 14 U.S. (1 Wheat.) 304, 4 L.Ed. 97 (1816):

"This constitution unavoidably deals in general language. It did not suit the purposes of the people, in framing this great charter of our liberties, to provide for minute specifications of its powers, or to declare the means by which those powers should be carried into execution. It was foreseen that this would be a perilous and difficult, if not an impracticable, task. The instrument was not intended to provide merely for the exigencies of a few years, but was to endure through a long lapse of ages, the events of which were locked up in the inscrutable purposes of Providence. It could not be foreseen what new changes and modifications of power might be indispensable to effectuate the general objects of the charter; and restrictions and specifications, which, at the present, might seem salutary, might, in the end, prove the overthrow of the system itself. Hence its powers are expressed in general terms, leaving to the legislature, from time to time, to adopt its own means to effectuate legitimate objects, and to mould and model the exercise of its powers, as its own wisdom, and the public

73. See: Skiriotes v. Florida, 313 U.S. 69, 61 S.Ct. 924, 85 L.Ed. 1193 (1941).

interests, should require." 14 U.S. (1 Wheat.) at 326–327.

The Legislature of Maine in passing the Act had a legitimate object to effectuate.

It has molded and modeled the exercise of its powers as its wisdom and the public interest required.

In doing so it has not run counter to the proscriptions of either the Constitution of Maine or the Constitution of the United States.

The Act, as construed and limited, violates no provision of either the Constitution of the United States or that of Maine.

Remanded to the Superior Court for further proceedings consistent with this opinion.

All Justices concurring.